**WEAVER CONSTRUCTION COMPANY,**
**Appellant,**

v.

**Edward L. RAPIER, Appellee.**

No. 17335.

Court of Civil Appeals of Texas.

Dallas.

Nov. 21, 1969.

Rehearing Denied Jan. 9, 1970.

Ben Warder, Jr., Carter, Gallagher, Jones & Magee, Dallas, for appellant.

Dean Carlton, David H. Rosenberg, Meer, Chandler, Carlton, Simon & Bates, Dallas, for appellee.

DIXON, Chief Justice.

Appellee Edward L. Rapier sued appellant Weaver Construction Company for damages to his home at 4079 Crown Shore Drive in Dallas, Texas. Appellee alleges that appellant, in the course of installing drainage and sewer pipes, caused dirt to be accumulated in mounds, so that the natural flow of surface rain water was impounded and diverted, resulting in the flooding of appellee's home.

In response to the first five issues submitted the jury answered as follows: (1) appellant, by maintaining piles of dirt, caused surface water to be diverted onto appellee's property; (2) which was negligence, and (3) was a proximate cause ·of damage to appellee's property; (4) the damage to the house and lot amounting to $8,310; and (5) the damage to personal property amounting to $665. Appellant objected and excepted to the submission of Special Issue No. 4.

The answer in regard to $665 for damage or loss of personal property and other findings of the jury favorable to appellee are not primarily involved in this appeal.

Appellant filed a motion asking the court to disregard the jury's answers to Special Issue No. 4. The motion was overruled. Judgment on the verdict was rendered for $8,975.

Appellant and appellee agree that the only points raised in this appeal concern the measure of damages submitted in Special Issue No. 4 in regard to appellee's house and lot. We therefore copy in full Special Issue No. 4 and the jury's answers thereto:

"ISSUE NO. 4

Find from a preponderance of the evidence the amount of damages, if any, to the house and lot owned by Edward Rapier, proximately caused by such diversion of surface water.

Answer separately in dollars and cents, or 'none,' with respect to each of the following elements of damage:

a. The reasonable cost of making such repairs as a homeowner of ordinary prudence would have made to remedy such damage:

Answer: $3,000.00

b. The difference between the reasonable cash market value of such house and lot before such damage occurred, and the reasonable cash market value of such house and lot after making the repairs, if any, inquired about in subdivision a. of this issue.

'Market value' means the amount which would be paid by a willing buyer who desires to buy but is not required to buy to a willing seller who desires to sell but is under no necessity of selling.

Answer: $5,310.00"

In seven points of error appellant contends that the court erred (1) in rendering judgment for appellee based on the answer to Issue No. 4b, because there is no evidence of permanent damage to appellee's house and lot; (2) in submitting Issue No. 4b, because same submits an incorrect measure of damages since there was no evidence of permanent damage; (3) in overruling appellant's motion to disregard the jury's answer to Issue No. 4b, since it submitted an improper measure of damages, there being no evidence of permanent damage to the house and lot; (4) in overruling appellant's motion to disregard the answer to Issue No. 4b, since the evidence established conclusively that appellee's house and lot could be restored to their former condition by repairing the damage caused by the flood; (5) because the evidence is insufficient to show any permanent damage to appellee's house and lot, therefore the evidence is insufficient to support the answer to Issue No. 4b; (6) because the answer to Issue No. 4b is so contrary to the great weight and preponderance of the evidence as to be clearly wrong; and (7) because in submitting Issue No. 4 the court

permitted the jury to make a double assessment of damages in the jury's answers to subdivision a. and subdivision b. of Issue No. 4.

Appellee's house was new. He moved into it immediately after it was finished. The flood came about three weeks later. Undoubtedly the house and lot suffered extensive damage. Some of the top soil of the lot was washed away. This has been rectified by bringing in several tons of dirt and resodding the lawn. Water and mud invaded the garage and portions of the interior of the house leaving injuries and stains which required repair and repainting. Small cracks appeared in the foundation, in the garage floor and in a wall. We shall not attempt to detail each and every item of damage. There is no evidence that any other property in the neighborhood was flooded.

■ It is well established that the proper measure of damages for permanent injury to real property is the difference between the reasonable cash market value of the property immediately before and immediately after the injury. Stafford v. Thornton, 420 S.W.2d 153, 159 (Tex.Civ.App., Amarillo 1967, writ ref'd n. r. e.); Crain v. West Texas Utilities Co., 218 S.W.2d 512 (Tex.Civ.App., Eastland 1949, writ ref'd n. r. e.); Lone Star Gas Co. v. Hutton, 58 S.W.2d 19 (Tex.Com.App. 1933, holding approved by Sup.Ct.); Trinity & S. Ry. Co. v. Schofield, 72 Tex. 496, 10 S.W. 575 (1889); 17 Tex.Jur.2d 144; 22 Am.Jur.2d 194, 201.

■ On the other hand if the injury is not permanent, but is temporary and the injuries are repairable so that the property can be restored to its former condition, the measure of damages is the reasonable cost of the repairs necessary to restore the property to its condition immediately prior to the injury plus the loss occasioned by being deprived of the use of the property. Bradley v. McIntyre, 373 S.W.2d 389, 394 (Tex. Civ.App., Houston 1963, writ ref'd n. r. e.); Texas Electric Service Co. v. Linebery, 333 S.W.2d 596, 598 (Tex.Civ.App., El Paso

1960, no writ); Victory Truck Lines v. Brooks, 218 S.W.2d 899 (Tex.Civ.App., Texarkana 1949, writ ref'd n. r. e.); 17 Tex.Jur.2d 144.

to appellee's property were temporary or

■ The question whether the injuries permanent was not submitted to the jury. However the submission of Special Issue 4b, inquiring as to the difference in the reasonable cash market value of the property before and after making the repairs, was a submission contemplating permanent injury to appellee's real property. Since appellant has contended that there is no evidence to support the submission of Special Issue 4b, or that the evidence is insufficient to support the jury's answer to Special Issue 4b, we must carefully examine the evidence.

One of the two witnesses who testified in regard to the crucial question was Rayford Cook, who has had many years' experience in the building and repair of houses. He viewed appellee's property within a few days after it was flooded. We reproduce the material part of his testimony:

"Q * * * based upon your experience in the field of repairing houses and of your own knowledge, in Dallas County, Texas, as of April 28th and 29th, 1966, do you have an opinion as to the reasonable cost of the necessary repairs thereto?

A Yes, sir. In my opinion it would be approximately $4,000 at that time.

*   *   *   *   *   *

"Q All right, now, assuming there were any cracks in the exterior walls; one of those pictures shows a crack in the slab, the concrete floor. Would there be a necessity to repair the foundation?

A Yes, sir, I would myself suggest that there be some reshoring done on the foundation in that portion, and reinforcement under that portion of slab.

Q What would be the reasonable and necessary cost of that?

A Are you speaking of now or at that time?

Q As of that time.

A I would say approximately $500.

*   *   *   *   *   *

"Q All right, was this job to be done —your testimony here was $4,000, was that to do the job in a good and workmanship manner?

A Certainly.

Q *And it is the type of job that would restore the house to the condition it was in before?*

A *Yes, sir.*

Q *And are you saying that you could perform your work in such a manner that any of this damage would not be noticeable?*

A *Yes, sir.**

*   *   *   *   *   *

"Q Mr. Cook, are you making any opinion with reference to what effect this house in a flood would have on the market value or are you just taking about the cost of repairs?

A I am taking about the cost of repairs, as far as my estimate is concerned.

Q All right, sir, so what you are talking about with reference to repairs, was that curing any defects or any cracks in the foundation or just shoring them up?

A It would not cure them.

Q And you didn't mean that your repairs wouldn't cure that?

A No, sir."

The only other witness who testified with reference to the matter which here concerns us was Thomas J. Morey, a licensed real estate broker and independent real estate appraiser. He did not see the property until September 1968, about two years and five months after the flood damage in April 1966. However he was shown fifteen pictures taken immediately after the flood.

* All emphases are ours.

We here reproduce the material portions of his testimony:

"Q Now, I would like to ask you whether or not prior to any of such damage that you saw, that is in its undamaged state, whether or not you have an opinion as to the reasonable cash market value of that house and lot in Dallas County, Texas, as of April 28th, 1966?

A Yes, I estimate the fair market value at that time to be $29,950.

*   *   *   *   *   *

"Q * * * Now, based upon those items that I have mentioned, do you have any opinion as to the reasonable cash market value of those premises, that house and that lot as of April the 30th, 1966, in Dallas County, Texas?

A As of that particular day?

Q As of that particular time, in that condition, before any repairs were made.

A Before any repairs were made, $19,600.

*   *   *   *   *   *

"Q Now, you wrote a letter to Mr. Rapier here on September the 19th, 1968, did you not?

A Yes, I did.

Q All right, sir. In that letter you told him that the market value was reduced $5900, didn't you?

A Yes, sir, that's correct.

Q All right, you just testified $10,000?

A Yes, sir, I did.

*   *   *   *   *   *

"Q All right, Mr. Morey, what is the difference between the two, for Mr. Dirksmeyer?

A The difference is the cost of repairs.

Q In other words, the reduction of fifty nine hundred dollars, is that the reduction after the repairs had been made?

A That is my estimate of value.

*   *   *   *   *   *

"THE COURT: Well, we will give him an opportunity to explain what he meant.

THE WITNESS: All right, sir, if I may explain. In order to measure a loss in market value, it is my theory that I went upon, that I must find sales of property that had sold after they flooded and compare them, if possible, if they had sold just before the flood, and that was the theory that I went on. I went into the market and located properties that had sold after they had flooded and I compared those with similar properties in the same area that had sold about the same time, but they had not flooded, *and from that differential I picked an arbitrary term and called it a loss ratio,* and from this group of different properties, some had sold just before flooding, and sold and resold and I had a measure of loss there.

*   *   *   *   *   *

"Q And an explanation how it was that it was that much of a decrease?

A *Well, my estimate—first of all, the fifty nine hundred dollars was based upon twenty per cent of the value of the property,* and some of these sales indicated more than twenty per cent and some less; this was a figure that appeared to me to be the proper one, after interpreting the sales and talking to the people that had bought and sold flooded properties. *I applied this twenty per cent to the original sales price or to the fair market value of the property just prior to the flood;* that was the $5900 and that was the term—or that was the loss in fair market value of the property after it had been fixed up, because the property that I inspected had not sold in a flooded condition, or the property that had sold had been repaired prior to their sale and I had to compare this property with other properties that had been flooded but re-

paired, and the differential would be my estimate to get it up to the place to where it would sell.

\* \* \* \* \* \*

"Q *Mr. Morey, are you saying this property could be repaired?*

A *Yes, sir.*

\* \* \* \* \* \*

"Q Now, some of those homes sold for more than the actual purchase price initially, when they were new?

A I don't know.

\* \* \* \* \* \*

"Q Now, here is one at 3816 Shorecrest. It says flooded in April of '66?

A Yes.

Q Sold in June of '67?

A Yes.

Q It sold for about $2500 more than it cost in April of '66, didn't it—right here (indicating)?

A Well, this is the one that I prepared.

\* \* \* \* \* \*

"Q *Where is Shorecrest with reference to Crown Shore Drive?*

A *Approximately four miles south.*

Q *All right, were they doing any construction work around there that you know of?*

A *No.*

\* \* \* \* \* \*

"Q *All right, sir, and where did the water come from?*

A *These houses back up to the Bachman Creek Lake area and it came from that particular watershed there.*

\* \* \* . \* \* \*

"Q No, sir, at any time that those houses that you did investigate, were they flooded in the month of April, 1966?

A Yes, sir.

Q And how many houses were there that you investigated or saw?

A Oh, I have investigated in excess of 20.

Q All right, sir, and where were these houses located?

A Well, I don't have the exact addresses, but they were in North Dallas.

\* \* \* \* \* \*

"Q *The houses that you saw flooded, were they over creekbeds, or on the creek?*

A *Yes, sir.*"

A study of the testimony of Rayford Cook discloses that he first testified unequivocally that the physical damage to the real estate could be repaired at a cost of $4,000 so that it would be restored to the condition it was in before the flood. His estimate included an item of $500 for correcting the small crack in the walls and for restoring the foundation and reinforcing the slab where a small crack had appeared. Then on re-direct examination he stated that the repairs would not cure defects in cracks in the foundation. But he immediately explained the last above statement by saying that he did not mean that the repairs would not cure such defects.

Thomas J. Morey, the professional appraiser, also stated that the property could be repaired. Then he gave it as his opinion that the property had diminished in market value in an amount of $5,900 after repairs had been made. Morey did not testify that the house had suffered any permanent physical injury caused by the flood water. It is obvious that he based his opinion on his belief that any house which has once been flooded necessarily suffers a loss in market value by reason of the fact that it has been flooded, regardless of the fact that the damage can be repaired so that the house is in as good condition after repair as it was in prior to the flood. This view

of Morey's testimony is in effect conceded by appellee in his brief. His Counterpoint No. C. is as follows: "The very fact that a house has been flooded causes a reduction in the market value of that house and thus causes permanent damages." This assertion ignores the rule that if a house can be repaired so that it is in as good condition as before the injury, the measure of damages is limited to the reasonable and necessary cost of repairs. Texas Electric Service Co. v. Linebery, 333 S.W.2d 596, 598 (Tex. Civ.App., El Paso 1960, no writ). 17 Tex. Jur.2d 144–145 and cases there cited.

Morey's opinion is based on a comparison with about twenty houses in other parts of town. Apparently the houses compared were damaged by flood waters in their natural course, not because of temporary obstructions which diverted the natural flow of the water. Some of these houses were located about four miles from appellee's house where they backed up to Bachman Creek Lake and the flood waters came from that particular watershed. Some of the compared houses were over creek beds or on the creek. Based on his investigation of those houses Morey adopted an arbitrary figure of 20 per cent of the original sales price or market value of a house as the amount any house loses as a result of the mere fact that it has once been flooded. Morey gave no testimony as to the age of the compared houses, the extent of the physical injuries they had suffered, or other data showing similarity to appellee's house.

After a careful consideration of the evidence we have concluded that we should and we do overrule appellant's first, second, third, fourth and seventh points. However we are convinced that the evidence shown in this record is insufficient to support the jury's answer to Special Issue No. 4b and for that reason the judgment should be reversed and the cause remanded. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951); " 'No Evidence' and 'Insufficient Evidence' ", Calvert, 38 Tex.L.Rev.

361 (1960). Appellant's fifth and sixth points are sustained.

The judgment of the trial court is reversed and the cause remanded to the trial court for another trial.