Wanda HARRIS and Bobby
Harris, Appellant,

v.

Joe Bill BELUE, M.D., Appellee.

No. 12–97–00098–CV.

Court of Appeals of Texas,
Tyler.

June 30, 1998.

---

Carl D. Bryan, Sulphur Springs, for appellant.

Mike Hatchell, Tyler, for appellee.

Before HOLCOMB and HADDEN, JJ., and BASS, Retired Justice, Twelfth Court of Appeals, Tyler, sitting by assignment.

HADDEN, Justice.

This is a medical malpractice case in which Appellants, Wanda Harris ("Harris") and her husband, Bobby Harris, brought suit against Dr. Joe Bill Belue ("Belue"), Appellee, alleging that Belue was negligent while performing a laparoscopic assisted vaginal hysterectomy ("LAVH") which proximately caused injury to Harris. Harris also alleged that Belue was negligent in failing to provide follow-up care. At the conclusion of Harris' evidence, the trial court granted Belue's motion for instructed verdict and rendered a take-nothing judgment against Harris. On appeal, Harris brings three points of error asserting that there was at least some evidence to support each of her allegations of negligence as well as damages. We will affirm in part and reverse and remand in part.

On January 4, 1994, Belue, Harris' gynecologist, performed an LAVH on Harris. During trial, Harris' expert witness, Dr. David Reeves ("Reeves"), described the LAVH procedure. He testified that it is a surgical procedure wherein small incisions are made in the abdominal cavity and wall, and tubes are placed in these incisions. Surgical instruments are then passed through the tubes and used to manipulate, staple and cut the pelvic contents to be removed. The surgeon visualizes the area within the abdominal cavity through an optic microscope which projects the area onto a television screen. The actual grabbing, stapling and cutting was performed by using an instrument described as an Endo GIA 30 stapler (sometimes called "the stapler"). The handle of this instrument is much like a pistol grip and the operative end is much like the jaws of an alligator. The surgeon opens the jaws and clamps down on the tissue where the surgeon needs to make an incision. The instrument then fires titanium staples, about 2 to 3 millimeters in size, into the tissue sealing off the tissue much like the traditional suture and needle. When fired, the staple's legs are passed through the tissue and are then closed or crimped into the characteristic "B" shape of a used staple. A knife blade then passes between the two sets of staples and severs the tissue. One set of staples leaves the body when the organs are removed and the other set, which closes the wound, remains in the patient. The stapler may also eject staples which are not stapled to any tissue. These staples become free floating and are deposited into the peritoneal cavity. According to Reeves, the free floating staples are not threatening to the patient whether the staple is open or closed.

Harris testified that following the LAVH she began experiencing severe abdominal pain, nausea, vomiting, and, alternately, diarrhea and constipation. She claimed that she reported these complications to Belue's office on several occasions, but there was no follow-up medical care by Belue. Three weeks after surgery, Harris' husband took her to a hospital emergency room where exploratory abdominal surgery was performed by Dr. R. Van Blair ("Van Blair") and Dr. Norman Hicks ("Hicks"). Van Blair and Hicks testified that during the course of that surgery, they found a staple which was attached to Harris' small bowel and mesentery, the tissue supporting the small bowel. Also at that location, the surgeons found an internal hernia of her bowel, a bowel obstruction, and ischemia requiring the removal of approximately seventy centimeters of Harris' small bowel. Harris was in the hospital for approximately eleven days following the second surgery. Harris' gastroenterologist, Dr. Charles O. Walker, testified that as a result

of the removal of that portion of her small bowel, she suffers from chronic diarrhea. Harris testified that because of this condition she was forced to resign from her job which she had held for several years.

In her first point of error, Harris asserts that the trial court erred in granting Belue's motion for instructed verdict on her cause of action based upon Belue's negligence during the LAVH because there was at least some evidence to support each of the elements of that cause of action. Specifically, she contends that in using the stapler during the LAVH, Belue negligently attached a staple to her bowel. There is evidence in the record that the staple attached to the small bowel and the mesentery was at a place where it should not have been and that its presence caused the bowel obstruction. Belue conceded these allegations in his motion for instructed verdict, but claimed that the motion should nevertheless be granted because: (1) there was no underlying evidence to support Reeves' conclusion that Belue actually fired the staple into the small bowel and mesentery where it was found and (2) the expert testimony was unreliable because there were equally probable explanations for the presence of the staple on the bowel. Belue claims that Reeves' expert opinion testimony, in which he concluded that Belue actually fired the staple into the injured location, was an assumption that was not based on any underlying evidence. He also claims that Reeves' opinion testimony does not meet the reliability tests for scientific evidence under current Texas law.

■ In a medical malpractice case, the plaintiff is required to show evidence of a reasonable medical probability that his injury was proximately caused by the negligence of the defendant. *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995). The general negligence standard of care for a physician is to undertake a mode or form of treatment which a reasonable and prudent member of the medical profession would undertake under the same or similar circumstances. *Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977). Because the standard of care demanded in medical malpractice cases requires skills not ordinarily possessed by lay persons, those cases typically require expert testimony to establish the medical standard of care. *St. John v. Pope,* 901 S.W.2d 420, 423 (Tex.1995) (citing *Hood,* 554 S.W.2d at 165–66).

■ In reviewing an instructed verdict, we examine the evidence in the light most favorable to the person suffering an adverse judgment and discard all contrary evidence and inferences. *S.V. v. R.V.,* 933 S.W.2d 1, 8 (Tex.1996); *Henderson v. Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex.1976); *Patton v. Saint Joseph's Hosp.,* 887 S.W.2d 233, 241 (Tex.App.—Fort Worth 1994, writ denied). If there is any evidence on a controlling fact about which reasonable minds could differ, the trial court's judgment must be reversed and the cause remanded for a new trial. *Henderson,* 544 S.W.2d at 650; *Zimmerman v. First American Title Ins. Co.,* 790 S.W.2d 690, 694 (Tex.App.—Tyler 1990, writ denied). In the instant case, the trial court granted the instructed verdict on both allegations of liability without specifying the grounds upon which the motion was granted. Therefore, Harris' burden is to show that the court's instructed verdict cannot be supported on the grounds set forth in Belue's motion. *Hycarbex, Inc. v. Anglo–Suisse, Inc.,* 927 S.W.2d 103, 108 (Tex.App.—Houston [14th Dist.] 1996, no writ); *Zimmerman,* 790 S.W.2d at 694.

■ We have reviewed the record, and conclude that the expert testimony, combined with the testimony of the treating physicians, raises a fact issue as to all elements of Harris' negligence cause of action. Reeves, a practicing physician for more than fifteen years and board certified in obstetrics and gynecology, testified regarding the procedure itself. He stated that he was formally trained in the use of the Endo GIA 30 stapler, and that he had used the instrument in his LAVH procedures approximately fifteen times a month. Reeves also set forth the standard of care in the use of the stapler in an LAVH procedure. He stated that the physician first clamps the tissue to be stapled into the jaws of the stapler, then carefully rotates and visualizes all sides of the stapler to see that no undesirable tissue is caught in its jaws. Once proper visualization is ob-

tained by the physician, he then fires the stapler to staple the tissue. He stated that the area of the operation is easy to see by virtue of the wide-angle lens on the optic microscope in the abdominal cavity. In performing an LAVH, the surgeon must include only the tissue intended to be cut and stapled. If for some reason the surgeon cannot see all sides of the stapler to see that no undesirable tissue is involved, then the surgeon should release the tissue from the jaws of the stapler and change positions. He testified that in the performance of an LAVH, a staple should not be placed in either the small bowel or the mesentery, a tissue that anchors and supports the small bowel, and that neither of these body tissues should be involved in the LAVH surgery. Belue himself agreed that it would be inappropriate to fire the stapler if there appeared to be any involvement in the stapler with the mesentery or the small bowel. Belue further agreed that it would not be a natural complication of the LAVH for a patient to have a staple in the small bowel or the mesentery following that procedure.

Van Blair, a general surgeon with training and experience in surgical procedures involving bowel obstructions, performed the emergency laparotomy on Harris three weeks after the LAVH by Belue. In his postoperative notes and reports made on the date of surgery Van Blair stated:

. . .

Findings: Internal Hernia with staple in the small bowel and attached to the mesentery. Short segment of ilium with questionable viability resected . . .

. . .

At operation patient is found to have internal hernia formed by a staple from the ileum to the mesentery of the ileum and then the bowel has internally torqued itself within the hernia and there is compromise of the small bowel vasculature.

. . .

On exploration there is found a staple through the small bowel at the ileum which attaches this to the mesentery of the small bowel and there is an internal bernia with the intestine compromised in this lumen.

The staple is removed from the mesenteric attachment and the bowel is uncoiled. The bowel appears very dark with ischemia along its length. The area is judged to be questionably viable. Because of this a primary resection and end-to-end anastomosis is done.

. . .

Then on deposition, Van Blair testified as follows:

Q: In this case, when you went into the patient and did your surgery, did you find an errant staple in the area of the small bowel?

A: A single staple was found which was adherent to the wall of the small bowel.

. . .

Q: Was the staple that you found that was adherent to the small bowel open as if it had never been fired or closed in kind of that characteristic "B" shape that would indicate it had been fired?

A: The staple was closed as if it had been fired. It had been—it had—one leg of the staple was still formed in the "B" shape, the other leg was unfolded as if it had been pulled loose from the tissue.

. . .

Q: Okay. And, again, that was connected there to the mesentery—the open end of the staple was connected to the mesentery by adhesion?

A: I believe—well. I believe that—I did not see the staple stapled through the mesentery. But, I believe what happened is that the staple had come unbent as the abdominal cavity was opened and the adhesion at that point was torn apart.

. . .

Q: But, again, it would have been connected to the mesentery by adhesion and pulled apart—

A: No. I believe it was stapled through the mesentery. . . .

Hicks, the physician who assisted Van Blair in the emergency laparotomy, testified in his deposition as follows:

Q: Can you tell the jury what you saw or what you found and tell us about the surgery and what was found?

. . .

A: ...We found a loop of intestine—distal, small intestine—that did not have a healthy appearance and was pulled together in a loop by a staple.

Q: So you say it was pulled together in a loop by a staple?

A: Yes.

Q: There was a staple there at the place where it was pulled together?

A: Yes.

Q: Did the staple being there cause the problem?

A: Yes.

Q: Was the staple through the bowel?

A: No.

Q: Can you tell the jury, was the staple attached to the bowel?

A: Yes.

Q: Would you please tell the jury how it was attached to the bowel?

A: From my standpoint, with the staple being transverse to my plane of vision, the left leg of the staple was straight and went into the wall of the bowel but not through the wall of the bowel. The bridge went across and the right side of the staple—I can't actually remember if it went into the mesentery just below the bowel on the distal end or whether it was into the bowel wall itself. I'm not sure.

Q: But one side of it was in the bowel wall?

A: Yes.

. . .

Q: Now the other end of the staple was attached to the mesentery. Is that correct?

A: Mesentery or bowel wall. I don't remember which. If it was not the bowel wall, it was just beneath it into the mesentery.

Q: But the staple had been fired, hand't it?

A: Yes.

. . .

Q: If that staple was fired and it ended up in that particular area attached to either the mesentery or the bowel, then do you have an opinion as to whether or not a staple should have been in that area?

A: A staple should not have been there.

. . .

Q: Can you think of another way—if it were crimped, can you think of another way that a staple would get where that one was without being fired into it?

A: No.

. . .

Q: You were saying that this was a bad thing that happened. Can you tell us why this was a bad thing that happened?

A: Well, it was bad in that it created a problem.

Q: And I think you told us that there shouldn't have been a staple fired in that area.

A: There should not have been a staple caught into the mesentery. If it was crimped, it shouldn't have been there.

. . .

Q: If one end was closed in the mesentery or in the bowel, the right end—which you don't remember if that was the case, but if that was the case, that would be an indication that it was fired into the location?

A: Yes.

Reeves testified that he reviewed Harris' hospital records relating to the LAVH procedure as well as the reparative surgery reports of Van Blair and Hicks. He also read the depositions of Belue, Van Blair, Hicks and other doctors involved in Harris' case. Reeves stated that in his opinion the errant staple that caused the obstruction in Harris' small bowel had been fired by Belue into the bowel and mesentery where it was found by

Van Blair and Hicks. Reeves concluded that Belue breached the proper standard of care of a surgeon when he performed the LAVH. He stated that in his opinion there was no other way for the closed or crimped end of the staple to get into the bowel wall and through the mesentery without being fired into that location.

Harris also called Dr. Roger Bothwell ("Bothwell") as an expert witness. Bothwell, a board certified general surgeon and practicing physician, testified that he was familiar with the use of the Endo GIA 30 stapler. He also stated that since the staple was crimped and was into the bowel and the mesentery, then the staple had to be fired there. Both Reeves and Bothwell testified that firing a staple into the wrong place could easily be avoided by simply rotating the stapling device, observing what is in the area of the stapler, and then repositioning the stapler if necessary.

Having reviewed the evidence in the light most favorable to Harris' position, disregarding all contrary evidence and inferences, we conclude that there is some evidence that Belue fired the errant staple into the small bowel and mesentery, breached the standard of care which he owed Harris, and thus caused Harris' injury. Consequently, the trial court erred in granting Belue's motion for instructed verdict.

■ Citing *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995), Belue asserts that the opinion offered by Reeves to support Harris' claim was without probative force and incapable of supporting a jury verdict since it was premised entirely on false assumptions. The court in *Crye* held that "[w]hen an expert's opinion is based upon assumed facts *that vary materially from the actual, undisputed facts*, the opinion is without probative value and cannot support a verdict or judgment." *Crye*, 907 at 499–500 (emphasis added). Belue argues that since Van Blair and Hicks did not actually testify that Belue fired the staple into the small bowel and mesentery, Reeves' conclusion is merely an assumption based upon nonexistent facts. We do not agree. Reeves' opinion was based upon the facts from Harris' medical condition, as determined during her second surgery. Van Blair stated in his postoperative notes made the day of the surgery that he found a staple in the small bowel. On the same day, he made a hospital case report wherein he stated that he found a staple through the small bowel which attached the bowel to the mesentery. In his deposition, Van Blair testified that the errant staple was closed as if it had been fired. He stated that one leg of the staple was still formed in the "B" shape, but that the other leg was unfolded as if it had been pulled loose from the tissue. He believed that at the time the first surgery was completed, the staple was formed in a "B" shape and it was stapled through the mesentery. He believed that the staple came unbent as he opened the abdominal cavity and the adhesion at that point was torn apart. Belue agreed that the depth of the bowel wall was greater than the size of the staple and that it would be possible for a staple to be into the bowel wall and protruding outside without going all the way through the bowel.

Hicks stated in his deposition that the intestine had been pulled together in a loop by a staple. He stated that the staple had been fired and was into the bowel wall, but was not attached by adhesions. The facts which Van Blair and Hicks found to exist in the abdomen of Harris during the second surgery were recorded on the day of the surgery and repeated again in their depositions. When presented with the factual evidence contained in Van Blair's and Hicks' reports and depositions, Reeves applied his medical knowledge and experience in the use of the stapler during an LAVH procedure and concluded that the errant staple was fired by Belue into the small bowel and mesentery. Reeves' methodology was simple deductive reasoning. Thus, it appears that Reeves did not assume that the staple was fired but rather based his opinion on factual findings made by Van Blair and Hicks.

■ Belue points out that both Van Blair and Hicks later testified that they saw nothing suggesting negligent conduct by Belue. However, the underpinnings for Reeves' conclusions were the facts which Van Blair and Hicks found at the time of the second surgery, not their opinions regarding the ulti-

mate issue of Belue's liability. Furthermore, their opinion evidence simply illustrates that reasonable minds can differ on a controlling fact issue and is part of that "contrary evidence and inferences" which we disregard in reviewing an instructed verdict. *S.V.*, 933 S.W.2d at 8.

Belue also asserts that Reeves' testimony as an expert is not reliable because it is not supported by the factors set forth in *E .I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex.1995).[1] Following the lead of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Texas Supreme Court held that the proponent of expert testimony must show that the expert's opinion is based upon a reliable foundation in order to keep out "junk science." *Robinson*, 923 S.W.2d at 556. The court further held that the trial judge, as the "gatekeeper," has the responsibility to make the preliminary determination of whether the proffered testimony meets the standard of reliability as set forth in *Robinson.*

Belue's reliance upon *Robinson* is without merit for two reasons. First, the expert testimony presented by Harris does not involve junk science using a new scientific methodology to reach its conclusion. It involves logical deduction. Van Blair and Hicks found the errant staple to be in or through the small bowel with one end crimped and the other one open but formerly crimped and pulled loose during the second surgery. From Reeves' experience, education and knowledge, a crimped staple in an LAVH operation would have to have been fired by the stapler in order to be in or through the small bowel. There was substantial evidence that the staple was in the wrong place. Thus, Reeves' conclusion that the staple had been fired by Belue during the LAVH surgery three weeks earlier was a

straightforward medical deduction based upon physical facts.

■ Secondly, the holding in *Robinson* is not persuasive regarding Belue's sufficiency arguments since the *Robinson* court's focus was on the trial court's exercise of discretion in admitting or excluding scientific evidence after a party lodges an objection to the reliability of its opponent's scientific expert testimony before trial or when the evidence is offered. *See Robinson*, 923 S.W.2d at 557. In the instant case, the expert testimony of Reeves and Bothwell was received by the trial court without objection as to its scientific reliability. The reliability of Reeves' and Bothwell's testimony was not mentioned until after Harris rested and Belue made his motion for instructed verdict. The Supreme Court has recently held that in order to preserve a complaint that scientific evidence is unreliable, a party must object to the evidence before trial or when the evidence is offered. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402 (Tex.1998). Without requiring a timely objection to the reliability of scientific evidence, the offering party is not given an opportunity to cure any defect that may exist and will be subject to trial and appeal by ambush. *Id.* Because Belue did not make any objection to the reliability of the testimony of Harris' experts before trial or when she offered their evidence, Belue cannot complain for the first time after Harris has rested her case. To allow otherwise would deny Harris' scientific experts the opportunity to "pass muster" in the first instance and would usurp the trial court's discretion as a "gatekeeper." *Maritime Overseas Corp.*, 971 S.W.2d at 410–11.

Belue further argues that the evidence shows that there were other possible explanations of how the errant staple became attached to the bowel, and that Reeves' conclu-

---

1. In *Robinson*, the court listed the following six non-exclusive factors which the trial court may consider in making this threshold determination:
   (1) the extent to which the theory has been or can be tested;
   (2) the extent to which the technique relies upon the subjective interpretation of the expert, 3 WEINSTEIN & BERGER, *supra*, ¶ 702[03];

   (3) whether the theory has been subjected to peer review and/or publication;
   (4) the technique's potential rate of error;
   (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
   (6) the non-judicial uses which have been made of the theory or technique.
   *Robinson*, 923 S.W.2d at 557.

sion is only one of several equally probable explanations for Harris' injury. Belue raises three alternate theories that were suggested by Van Blair as other possible causes: (1) attachment through an adhesion at the site of the bowel obstruction that may have been caused by blood seeping through an incision and acting like glue to bind two parts of the intestinal tract together; (2) the ejection of an improperly formed free floating staple into the patient's abdominal cavity which could snag, entangle or even penetrate organs in the abdomen such as the small bowel; and (3) the stapler's production of a partially deformed staple that was not properly closed on the ends or had one leg crimped and the other one open, which could be caused even when the stapler is fired into the correct tissue. However, there was no testimony supporting these alternate theories. There was no evidence of seeping blood at the site of Harris' bowel obstruction, and there was no evidence that the stapler ejected any malformed or free floating staples into Harris' abdominal cavity. Without factual support in the record justifying the application of these theories, they rise to little more than conjecture and cannot be explanations which are equally probable in the face of the factual evidence supporting Reeves' conclusions. Even if these theories had factual support in the record, our standard of review is to disregard all contrary evidence and inferences and to consider the evidence in the light most favorable to Harris. For the above reasons, point of error one is sustained.

■ In point of error two, Harris asserts that the trial court erred in granting the instructed verdict because there was some evidence to support her cause of action against Belue for negligently failing to provide proper care in diagnosing and treating her injury. Belue contends, however, that Harris abandoned her claim of negligent postoperative care because there was a lack of proximate cause evidence to support such a claim during trial and because she has failed to properly urge her allegation on appeal. We agree. As Belue points out, Harris has devoted little more than one sentence in her brief to her cause of action for negligent postoperative care and has further failed to furnish any argument or authorities

to support that position in accordance with TEX. R. APP. P. 74(f). In the interest of justice, however, we will address the point.

The evidence shows that when Harris began experiencing abdominal pain, diarrhea and constipation, she called Belue's office. There is some dispute as to how many calls she made during the three-week period between operations, but it appears that the telephone records show at least five calls were made. Harris testified that although she asked for Belue, at no time did she speak to him but merely talked with one of the office personnel who instructed her to continue to take her medicine and follow the directions on the sheet which was furnished her when she was dismissed. There is no evidence, however, that would support a respondeat superior theory, or that would show her complaints were relayed to Belue by his office personnel.

Bothwell testified that the standard of care for postoperative patients would be that if the patient called in with complaints of diarrhea, constipation or cramps, he would return the call of that patient the first chance that he had. He stated that the call would particularly concern him if the patient was one who had an abdominal surgery, and that he would have the patient come in for an examination. Bothwell concluded that it was a dereliction of Belue's obligation to not have the patient back into his office and that the doctor would be negligent in that circumstance. Thus, there may be some evidence that Belue breached his standard of care in his postoperative treatment of Harris. However, as Belue contends, we find no evidence to support Harris' claim that Belue's failure to provide postoperative care caused or contributed to her injury. An instructed verdict is proper where there was no evidence that a doctor's postsurgical care caused any damages. *Rea v. Gaulke*, 442 S.W.2d 826, 831 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.). Because Harris has failed to support her claim that the negligent postoperative care was the proximate cause of her injury, point of error two is overruled.

■ In point of error three Harris alleges that the trial court erred in granting Belue's motion for instructed verdict on her

claim for lost wages and loss of earning capacity because there was at least some evidence to support each of the elements of her claim. We agree. As Harris argues, loss or impairment of past and future earning capacity may be recovered as an element of damages in a personal injury case. *Bonney v. San Antonio Transit Co.,* 160 Tex. 11, 325 S.W.2d 117 (1959). The jury may reach its own conclusion based on evidence of the injured person's age, health and physical condition prior to the injury, and the permanence of the injury. *Borden, Inc. v. Guerra,* 860 S.W.2d 515, 524 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.). Lost earning capacity need not be based on any specific degree of physical impairment, but may be based on a composite of all the factors affecting capacity. *Goldston Corp. v. Hernandez,* 714 S.W.2d 350, 352 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.).

In the instant case, there is evidence that Harris has endured two surgeries, has lost approximately seventy centimeters of her small bowel, suffers from chronic stomach pains and alternating diarrhea and constipation, has onerous restrictions on her diet, is no longer able to work, and has a very limited social life as a result of her condition. With regard to Harris' chronic diarrhea and constipation, this condition is permanent and is a result of the removal of the seventy centimeters of her small bowel. Further, Harris testified as to her age, her employment status prior to her injury, her hourly wage prior to the injury, the amount of time she was absent from her employment after the injury, and how her condition eventually led to her having to quit her job entirely. Clearly, this testimony was some evidence of her damages, including her loss of wages and loss of earning capacity. Point of error three is sustained.

Accordingly, the trial court's judgment on Harris' cause of action arising out of Belue's alleged negligence in failing to provide post-operative care is *affirmed.* In all other respects the judgment is *reversed and remanded for new trial.*