## CROWN CENTRAL PETROLEUM CORPORATION, Appellant,

v.

## COASTAL TRANSPORT COMPANY, INC. and Brenco Marketing Corporation, Appellees.

No. 14–99–00688–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 11, 2001.

Rehearing Overruled March 15, 2001.

---

John L. Hagan, Houston, for appellants.

Henry S. Platts, Jr., Wilton F. Chalker, Robert M. Roach, Jr., Houston, Dana Livingston Cobb, Austin, for appellees.

Panel consists of Justices HUDSON, JOE L. DRAUGHN, and MAURICE E. AMIDEI.*

## OPINION

JOE L. DRAUGHN, Justice (Assigned).

Crown Central Petroleum Corporation ("Crown Central") appeals from an unfavorable judgment in an action for negligence and gross negligence arising from an explosion and fire at a bulk loading facility. We affirm the trial court's judgment in part and reverse and remand in part.

### FACTUAL AND PROCEDURAL BACKGROUND

Crown Central owned a bulk loading facility in Pasadena, Texas, for the purpose of loading gasoline and other petroleum products into tank trailers. On September 28, 1993, a trailer owned by Coastal Transport Company, Inc. ("Coastal") and operated by Drexel Stewart, a Coastal employee, was being loaded when one of its tanks overfilled, spilling gasoline. At that time, a second trailer owned by Brenco Marketing Corporation ("Brenco") and operated by Russell Bennett, a Brenco employee, had entered the facility and was pulling into the loading bay adjacent to Coastal's trailer. The engine on Brenco's trailer ignited gasoline vapors that had spilled from Coastal's trailer, causing an explosion and fire.

Crown Central brought claims for negligence against both Coastal and Brenco and a claim for gross negligence against Coastal, seeking damages from both and exemplary damages from Coastal. A jury trial began on November 16, 1998. At the close of Crown Central's case-in-chief, the trial court granted Coastal's motion for a directed verdict on the ground that the evidence did not support an award of exemplary damages. At the close of all evidence, the trial court granted Brenco's motion for a directed verdict on Crown Central's negligence claim. Crown Central's remaining claim for negligence against Coastal was submitted to the jury.

The jury found that Coastal was negligent. With respect to damages, the jury was asked whether the injury to Crown Central's facility was permanent or temporary. The jury answered that the injury was temporary, and the trial court entered judgment based on this finding. However, the damages award was subject to Coastal's written election, under TEX.CIV.PRAC. & REM.CODE ANN. § 33.014 (Vernon 1997), to reduce the amount of damages by a credit equal to the dollar amount of Crown Central's prior settlement with another party. Because this settlement was greater than the amount of damages awarded, the trial court entered judgment that Crown Central take nothing.

In four points of error, Crown Central complains of (1) the directed verdict in favor of Brenco on Crown Central's negligence claim; (2) the jury's finding that Crown Central's injury was temporary; and (3) the directed verdict in favor of Coastal on Crown Central's claim for exemplary damages.

---

* Senior Justice Joe L. Draughn and Former Justice Maurice Amidei sitting by assignment.

### ALLEGED NEGLIGENCE OF BRENCO

In its first two points of error, Crown Central contends that the trial court erred in granting Brenco's motion for a directed verdict on Crown Central's negligence claim.[1] An instructed verdict is proper when (1) a defect in the pleadings makes them insufficient to support a judgment, (2) the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law, or (3) the evidence offered on a cause of action is insufficient to raise an issue of fact. *Kline v. O'Quinn*, 874 S.W.2d 776, 785 (Tex. App.—Houston [14th Dist.] 1994, writ denied). This court must decide whether there is any evidence of probative value to raise issues of fact on the question of Brenco's negligence. *See Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994) (per curiam). In doing so, we must consider all of the evidence in a light most favorable to Crown Central, disregard all contrary evidence and inferences, and give Crown Central the benefit of all reasonable inferences created by the evidence. *See id.*

Crown Central asserts that it presented sufficient facts to raise a fact issue regarding Brenco's negligence. We conclude that a directed verdict was proper because Crown Central failed to provide more than a scintilla of evidence to establish that Brenco's alleged conduct was a proximate cause of the accident.

To prevail on a negligence claim, a plaintiff must prove that the defendant's negligence was a proximate cause of the plaintiff's injury. *See Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). The components of proximate cause are cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995). These elements cannot be established by mere conjecture, guess, or speculation. *Id.*

Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred. *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995). Even if the injury would not have happened but for the defendant's conduct, the defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation. *See id.*

Crown Central argues that Brenco was negligent because its driver, Russell Bennett, should have waited for the exit to be clear before proceeding in to the loading bay. The mere act of driving the truck into the loading bay, without more, was not negligence. Even if Bennett's exit had not been obstructed, however, the accident would still have occurred. Negligent conduct cannot be regarded as a substantial factor in bringing about an injury if the harm would have been sustained even if the defendant had not been negligent. *See Tex. & Pac. Ry. Co. v. McCleery*, 418 S.W.2d 494, 497 (Tex.1967).

Viewed generally, it may be said that the injury in this case would not have happened but for Bennett's conduct, but only in the "philosophic" sense, which includes every possible series of events without which any happening would not have occurred. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex.1991) (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)). The proper test for legal causation, however, is whether the negligent act or omission was a substantial factor in bringing about the injury. We find that Crown Central failed to present sufficient evidence to raise a fact issue regarding whether Bennett's failure to wait until his

---

1. In the statement of its points of error, Crown Central erroneously refers to "Broach Marketing Corporation." At trial, three related entities were named as defendants—Brenco Marketing Corporation, Broach Equipment Corporation, and Broach Oil Company, Inc. At the close of Crown Central's case-in-chief, the trial court directed a verdict in favor of the two Broach entities. As its brief makes clear, Crown Central challenges only the trial court's directed verdict in favor of Brenco at the close of all the evidence.

exit was clear was a substantial factor in bringing about Crown Central's injury.

■ Crown Central also suggests that Brenco may have been negligent because Bennett "did not 'kill' his engine immediately" when he first noticed that gasoline was spilling from the Coastal trailer. However, Crown Central failed to present any evidence suggesting that this alleged act of negligence was even a "but for" cause of the accident. There is no evidence that the explosion would not have occurred if Bennett had turned off his engine sooner than he did. We conclude that no issue of fact was raised as to whether Bennett's alleged delay in "killing" his engine was a cause in fact of Crown Central's injury.

■ The second component of proximate cause is foreseeability. In the context of proximate cause, foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 737 (Tex.1998). As with cause in fact, the proper focus is on the particular act or omission that is alleged to be negligent. The plaintiff must show that the danger created by an allegedly negligent act or omission was of the type that should reasonably be anticipated from such an act or omission. *Cf. Phan Son Van v. Peña*, 990 S.W.2d 751, 755 (Tex.1999) (concluding that sexual assaults and murders committed by teenage gang members were not a foreseeable result of a shopowner's negligent sale of alcohol to minors because such acts are "not the type of harm that would ordinarily result from such a sale").

■ A reasonable person might conclude that the act of proceeding into a bulk loading facility without waiting until the exits are clear creates a danger that the driver will be unable to escape a situation where immediate access to an exit would be necessary. Crown Central presented no evidence, however, from which a person of ordinary intelligence might an-

ticipate that Bennett's actions created the type of danger that existed in this situation, where evasive action would not have prevented the accident. Although a plaintiff is not required to show that the particular accident complained of should have been foreseen, *see Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex.1985), foreseeability does require that "the injury 'might reasonably have been contemplated' *as a result of the defendant's conduct.*" *Doe*, 907 S.W.2d at 478 (quoting *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex.1980)) (emphasis added). We find that there was no evidence that the explosion and fire was a foreseeable result of Bennett's failure to wait until his exit was clear before he proceeded into the loading bay.

Crown Central failed to present sufficient evidence to raise an issue of fact regarding whether Brenco's alleged negligence was a proximate cause of Crown Central's injury. Accordingly, we hold that the trial court did not err in directing a verdict for Brenco on Crown Central's negligence claim. Crown Central's first two points of error are overruled.

### PERMANENT OR TEMPORARY INJURY

■ In point of error three, Crown Central challenges the jury's finding that the injury to the bulk loading facility was temporary. The question and instruction submitted to the jury were as follows:

Did the Terminal Incident cause a permanent or a temporary injury to the bulk loading facility owned and operated by Crown?

The character of an injury as either permanent or temporary is determined by its continuum. Permanent injuries are those which are constant and continuous not intermittent or recurrent. A permanent injury results from an activity which is of such a character and existing under such circumstances that it will be presumed to continue indefinitely. The term "permanent" does not mean perpetual or forever.

Temporary injuries are those which are not continuous but are sporadic and contingent upon some irregular force. An injury which can be terminated cannot be a permanent injury.

Answer "Permanent" or "Temporary":

Crown Central does not dispute the trial court's definitions of permanent and temporary injuries. The jury answered that the injury was temporary.

■ Crown Central argues that this finding is against the great weight and preponderance of the evidence.[2] In reviewing a factual sufficiency challenge, we must consider and weigh all the evidence, and should set aside the jury's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

Crown Central argues that the evidence it presented overwhelmingly established that its bulk loading facility was totally destroyed by the explosion and fire. At trial, Crown Central introduced pictures of the facility taken before and after the incident. Crown Central points to testimony from Nelson Bruns, an engineering consultant hired by Crown Central, that upon his inspection of the facility after the explosion, the loading rack was "gone" and that the area around it was "wiped clean ... there was burnt concrete." Crown Central also presented testimony from its terminal superintendent, Eddie Senterfitt, that Crown Central's facility was unable to provide any loading services after the explosion and fire. Thus, Crown Central contends that the complete destruction of its facility was constant and continuous, and therefore a permanent injury.

In response, Coastal presented evidence that the injury to Crown Central's facility

was not continuous, but could be terminated if Crown Central had decided to rebuild. For example, Bruns testified that the facility could have been rebuilt and restored to the condition it was in right before the fire in six to twelve months, at a cost of between $600,000 to $750,000. Crown Central's own expert, W. Clifford Atherton, a financial analyst, testified that he calculated Crown Central's lost profits only over a period of nine months based upon a reasonable estimate of the time it would have taken for Crown Central to rebuild the terminal and restore it to its prior use. A review of the record reveals no contrary evidence to the assertion that Crown Central could have restored its facility to the same condition it was in before the fire, in less than one year.

Furthermore, another of Crown Central's experts, David Lewis, a real estate appraiser, testified that he calculated the market value of the bulk loading facility based on estimates of the income it would have produced. On cross-examination, Lewis stated that if damage to property is determined based on the loss of its ability to produce income, once the lost income stream is replaced, there is no longer a loss. Thus, the record contains ample evidence from which a jury could find that the injury to Crown Central could have been terminated.

Crown Central argues, however, that its ability to rebuild the facility is not relevant to the question of whether its injury was permanent or temporary. In support of this contention, Crown Central relies primarily on the Texas Supreme Court's opinion in *Pacific Express Co. v. Lasker Real–Estate Ass'n,* 81 Tex. 81, 16 S.W. 792 (1891). *Lasker* involved the partial destruction of a house from a fire allegedly caused by the defendant's negligence. The trial court awarded damages based on

---

**2.** In its brief, Crown Central also argues that the evidence showed that its injury was permanent as a matter of law, and asks the Court to render judgment in accordance with such a finding. However, any challenge to the legal sufficiency of the evidence supporting the

jury's finding has been waived by Crown Central's failure to preserve such error in the trial court. *See Steves Sash & Door Co. v. Ceco Corp.,* 751 S.W.2d 473, 477 (Tex.1988) (listing the five ways to preserve a "no evidence" point of error).

the amount it would take to place the house in the same condition it was in before the fire. The supreme court reversed, concluding that "the measure of compensation applied in this case would be manifestly unjust." *Id.* at 794. The court further stated:

In cases such as this, in which the ownership of a house, and the land on which it stands, is in the same person, we are of opinion that the house should be treated, as it is in other cases, as a part of the land, in determining the damages such an owner is entitled to recover on account of the partial or total destruction of a house. If the difference between the value of land immediately before and after a house on it is injured or destroyed, with interest on the sum thus ascertained from the time of the injury, be adopted as the true measure of damages in such cases, we have a rule certain in its application, and that will give just compensation in all cases not exceptional in character; while, if the rule adopted in this case be applied, it will frequently occur that this just result will not be reached.

*Id.* Crown Central thus argues that under *Lasker*, any time a building is damaged or destroyed, the only proper measure of damages is the difference in the value of the land (including the house) before and after the injury, and thus must be considered a permanent injury.

A careful reading, however, shows that the court in *Lasker* did not intend such a broad holding. Indeed, the court specifically states that "[c]ases may arise in which the measure of damages adopted by the [trial] court would be equitable." *Id.* at 793. In *Lasker*, the court noted the potential difficulties in applying the cost of rebuilding where the house in question was old, and thus could not be rebuilt without substantial improvements. The court also observed that "[i]n this time of rapid improvement in means of transportation," the value of business property can quickly depreciate, and a plaintiff who erected an expensive building on property that is no longer in a desirable location would receive a windfall if allowed to recover the costs of rebuilding. *Id.* at 793–94. The court concluded: "The purpose, in every case, is to compensate the owner for the injury received, and the measure of damages which will accomplish this in a given case ought to be adopted." *Id.* at 793.

We conclude that where there is evidence in the record that the injured property could have been restored to its original condition, a jury is entitled to find that the injury in question is temporary, provided that the resulting award is not inequitable. Other courts have agreed, holding that if a house can be repaired so that it is in as good condition as before the injury, the proper measure of damages is the reasonable and necessary cost of repairs. *See Moren v. Pruske,* 570 S.W.2d 442, 444 (Tex.Civ.App.—San Antonio 1978, writ ref'd n.r.e.); *Weaver Constr. Co. v. Rapier,* 448 S.W.2d 702, 703 (Tex.Civ. App.—Dallas 1969, no writ). Crown Central does not challenge the reasonableness of the cost of repairs as found by the jury, nor does it contend the measure of damages adopted by the trial court, based upon the jury's finding that the injury was temporary, was inequitable.

In its oral argument, Crown Central also relied on the cases of *Ft. Worth & N.O. R. Co. v. Wallace,* 74 Tex. 581, 12 S.W. 227 (1889) and *Tarrant County v. English,* 989 S.W.2d 368 (Tex.App.—Fort Worth 1998, pet. denied). These cases are distinguishable from the present case, however, as both deal specifically with injuries to the land itself as opposed to a building upon the land. *See Wallace,* 12 S.W. at 228 (noting that "injury to the turf and sod," which is of a permanent nature, "differs from an injury to a growing crop, which does not result in any injury to the land as distinguished from the crop").

We hold that the jury's finding of a temporary injury to Crown Central's bulk loading facility was not so contrary to the

great weight and preponderance of the evidence as to be clearly wrong or unjust. We overrule Crown Central's third point of error.

## EXEMPLARY DAMAGES

■ Finally, Crown Central contends that the trial court erred in granting a directed verdict as to exemplary damages. Crown Central asserted claims against Coastal for both negligence and gross negligence. At the close of Crown Central's case-in-chief, Coastal moved for a directed verdict on the grounds that Crown Central (1) failed to meet its burden of proof with respect to actual damages and (2) failed to present sufficient evidence to support an award of exemplary damages under the standard set forth in *Transportation Insurance Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994). The trial court granted Coastal's motion for a directed verdict on exemplary damages. Again, our review requires us to determine whether there is any evidence of probative force to raise a fact issue on the question of gross negligence, considering all of the evidence in a light most favorable to Crown Central and disregarding all contrary evidence and inferences. *See Szczepanik*, 883 S.W.2d at 649.

■ To recover exemplary damages resulting from gross negligence, a party must establish two elements:

(1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and

(2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. [*Moriel*, 879 S.W.2d at 23.]

■ With respect to the first, objective element of gross negligence, the Texas Supreme Court has stated that "the 'extreme risk' prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather 'the likelihood of serious injury' to the plaintiff." *Id.* at 22 (quoting *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 327 (Tex.1993)). It must be the defendant's conduct that creates the "extreme degree of risk." *See Convalescent Servs., Inc. v. Schultz*, 921 S.W.2d 731, 735 (Tex.App.— Houston [14th Dist.] 1996, writ denied). To determine if the defendant's acts or omissions involve extreme risk, we must analyze the events and circumstances from the defendant's perspective at the time the harm occurred without resorting to hindsight. *See id.*

■ Under the second element of gross negligence, the defendant must have actual awareness of the extreme risk created by its conduct. An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent. *Moriel*, 879 S.W.2d at 22. The plaintiff must further show that the defendant was consciously indifferent to the risk of harm. *Id.* The defendant's subjective mental state can be proven by direct or circumstantial evidence. *Id.* at 23.

Crown Central contends that Coastal was grossly negligent for continuing to use a certain overfill prevention system on its trailers that was manufactured by Liquidometer. Each such system included a probe that was designed to sense the level of gasoline or other material within the tank. Some of the Liquidometer probes were made with heat shrink rubber tubing that would unintentionally expand and cover a portion of the probe, rendering the entire system inoperative. This problem was dubbed "creepy crawler" by those familiar with the probes, due to the tubing's apparent tendency to creep and crawl down the length of the probe's shaft. Crown Central's engineering expert testified that the probe in the Coastal trailer that overfilled in this case was inoperative due to an expansion of the probe's tubing.

To support its claim of gross negligence, Crown Central relies primarily upon the testimony of its trucking safety expert, Arthur Atkinson. Atkinson testified as follows:

Q: When viewed objectively from Coastal's point of view at the time of the September '93 incident, in your opinion, did Coastal's failure to stop using probes that could have creepy-crawler problems, did that involve a high degree of risk, considering the probability and magnitude of the potential harm to others?

A: Yes, it did, very high.

Q: In your opinion, Mr. Atkinson, did both the magnitude and the probability of the anticipated injury to somebody like Crown Central Petroleum Corporation, if an overspill occurred due to a creepy-crawler problem, involve a likelihood of serious injuries?

A: Yes, sir, absolutely.

. . . .

Q: In your opinion, did Coastal have an actual subjective awareness of the risk involved in failing to stop using probes that can have creepy-crawler problems?

A: Yes, again and again.

Q: And in your opinion, did Coastal nevertheless proceed with conscious indifference to the rights, safety, or welfare of others?

A: That's the only conclusion I can draw. With all of the evidence as a whole and not just nit-picking along, if we look at the whole picture of what everybody in Coastal, from the very top, the president, all the way down to the bottom knew, that that's the only conclusion I can draw, because, you see, the character of the king permeates the king-dom. So what the top man does and says is what the guy down at the bottom's going to do. He's going to emulate that.

■■■ An expert may testify that a defendant's conduct constitutes gross negligence. *See Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987). Coastal argues, however, that the opinions of Crown Central's expert are factually unsubstantiated and therefore legally insufficient to support a judgment, citing *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997). In *Havner*, the Texas Supreme Court held that an expert's testimony that use of the drug Bendectin caused the plaintiff's birth defect was legally insufficient to support a finding of causation because the expert's opinion did not have a scientifically reliable basis. *Id.* at 730. However, in *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402 (Tex.1998), the supreme court held that in order to preserve such an objection—that an expert's testimony is unreliable and therefore constitutes no evidence—"a party must object to the evidence before trial or when the evidence is offered." *Id.* at 409. As the court stated in *Ellis*, without a timely objection, the offering party is denied an opportunity to cure any defect that may exist, and therefore may be subject to "trial and appeal by ambush." *Id.* Although the expert testimony in *Ellis* went unchallenged until appeal, the same concerns apply when a "no evidence" complaint is raised for the first time in a motion for directed verdict after the plaintiff has rested its case. *See Harris v. Belue*, 974 S.W.2d 386, 393 (Tex.App.— Tyler 1998, pet. denied).

■■■ Nothing in the record indicates that Coastal lodged an objection to the substance of Atkinson's testimony before trial. Although Coastal's counsel objected at trial to other portions of Atkinson's testimony,[3] he did not raise any objections

---

3. At one point during Atkinson's testimony, Crown Central's counsel posed a hypothetical and asked whether such conduct would show "a wanton and willful disregard of safety and of other people's property." Coastal's counsel objected that the question was "not a

to the portion of testimony cited above, in which Atkinson opined that Coastal's conduct involved a very high degree of risk, involving a likelihood of serious injuries; that Coastal had an actual subjective awareness of the risk involved; and that Coastal nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Because Coastal did not object to this testimony either before trial or at the time it was offered, Coastal waived its right to assert, after Crown Central rested, that such expert testimony constituted no evidence to support a finding of gross negligence. *See id.*

■■■ Coastal also cites to *Williams v. Gaines,* 943 S.W.2d 185 (Tex.App.—Amarillo 1997, writ denied), which states that "[i]ncompetent evidence, even if not objected to at trial, may not be considered as probative in determining the legal and factual sufficiency of the evidence." *Id.* at 193. In *Williams,* the jury awarded damages based upon an expert's testimony, presented without objection, as to the fair market value of certain property. The court of appeals reversed, concluding that the expert's opinion "did not meet the definition of fair market value given in the jury's instructions," and therefore "was not determinative of the fair market value as that term was defined for the jury." *Id.* Here, there is no suggestion that Atkinson's testimony falls outside the recognized standards for gross negligence. Rather, Coastal contends that the substance of Atkinson's opinions is unreliable and therefore has no probative value. As noted above, such a complaint must be raised before trial or when the evidence is introduced, or else it is waived.

Furthermore, the record does not support a conclusion that Atkinson's testimony varied materially from undisputed facts, *see Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995), or that it constitutes nothing more than a "bald assertion" based on "speculation and conjecture." *See General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 591 (Tex.1999). A review of the record shows that Atkinson relied upon the following evidence to support his opinions:

(1) In 1989, an overfill incident occurred in Austin, Texas, involving a Coastal trailer. That overfill involved a defective creepy crawler probe of the same type that apparently was involved in this incident.

(2) An inspection by Coastal's terminal manager in Austin following the 1989 incident revealed three more creepy crawler probes in Coastal's fleet.

(3) Coastal's owner was informed by the manufacturer in 1989 of a potential problem involving creepy crawler probes.

(4) Three additional spills occurred in 1992 and 1993 involving Coastal trailers on which the high-level sensors in the overfill prevention system failed. Although there was no evidence as to the specific probe defect involved in those spills, Atkinson opined that the creepy crawler problem was "[m]ost probable."

(5) Lucas Peña, Coastal's primary maintenance worker on trailers, testified that he experienced probes with the creepy crawler problem in Coastal's trailers and replaced them.[4]

(6) Richard Schneider, a sales representative with Scully (a competing manufacturer of overfill prevention systems which, by 1993, had acquired

subject matter of expert testimony." Later, Atkinson was asked for an opinion concerning "Coastal's safety policies as they relate to the possibility of the defective probes." Coastal's counsel "object[ed] to the standard as being impermissible." The trial court overruled both objections.

4. Peña testified by deposition that when Coastal's drivers complained to him about problems with the probes on their trailers, he would inspect the probes and replace the "sleeve-type" probes with a different "epoxy" probe.

Liquidometer) held at least two seminars in 1993, attended by Coastal employees. At these seminars, the dangers of creepy crawler probes were discussed, and Schneider testified that he told those in attendance that the Liquidometer probes were dangerous and recommended that they be removed and replaced.[5]

We conclude that the evidence presented by Crown Central is sufficient to raise an issue of fact with respect to both prongs of gross negligence under *Moriel.* Crown Central's fourth point of error is sustained.

### CONCLUSION

For the reasons stated, we reverse the portion of the trial court's judgment granting a directed verdict to Coastal on Crown Central's cause of action for gross negligence and remand for further proceedings consistent with this opinion. The remainder of the trial court's judgment is affirmed.

---

**5.** The pertinent portion of Schneider's testimony, presented by deposition, is as follows:

Q: Well, did you consider the creepy crawler problem dangerous enough that the probes in those trailers should be removed and replaced?

A: I conveyed that message to the people responsible for those trailers and that was their choice.

Q: And that was what?

A: That was their choice.

Q: Their choice to what?

A: To change that probe out or go through the truck or put a new system on. I gave them the message—

Q: And their choice—their choice was to buy—they couldn't—could they buy a Liquidometer replacement probe that was safe from Scully?

A: They could buy a redesigned Liquidometer probe from Scully. That was a static probe and was not a self-checking probe.
. . . .

Q: Okay. And if they—if they looked at a—pulled out a probe and they looked at it and it didn't have this creepy crawler problem—that is, the sheathing or the tubing was where it should be and not extending below the prism—there wouldn't have been any reason for them to replace those, would there?

A: I never—let's see how to say this. I never said that because the sheath was low it was a good probe. Any Liquidometer probe purchased *prior* to Scully's redesign and remanufacture to stop the creepy crawler was subject to the issue.

Q: Well, did you tell Coastal—Mr. Peña and the other Coastal employees and other end users to remove any—remove and replace any Liquidometer probes other than the ones that were obviously affected with *this* creepy crawler problem?

A: I told them to trash the whole system and put a new one on if they wanted a safe system.