ACCEPTED
14-14-00010-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
4/29/2015 11:19:20 AM
CHRISTOPHER PRINE
CLERK

# No. 14-14-00010-CV

In the Fourteenth Court of Appeals
Houston, Texas

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
4/29/2015 11:19:20 AM
CHRISTOPHER A. PRINE
Clerk

**WENDY SCHREIBER,**
Appellant/Cross-Appellee,

v.

**STATE FARM LLOYDS,**
Appellee/Cross-Appellant.

On Appeal from the 190th District Court
Harris County, Texas
Trial Court Cause No. 2012-03419

## APPELLANT'S SUPPLEMENTAL AUTHORITIES

TO THE HONORABLE FOURTEENTH COURT OF APPEALS:

Appellant Wendy Schreiber submits these supplemental authorities, both published within the past few days, in support of her appeal of the trial court's judgment.

If there were any doubt about the admissibility or discoverability of the facts relating to Blevins's and Deutsch's bias, prejudice, and reputations for truthfulness, the Texas Supreme Court has put that to rest:

Relevance also governs the scope of cross-examination in Texas, as the rules allow witnesses to be cross-examined "on any matter relevant to any issue in the case." Tex. R. Evid. 611(b). And it is well established that "**any fact** which bears upon the credit of a witness would be a relevant fact, ... whether it goes to his indisposition to tell the truth, his want of opportunity to know the truth, his bias, interest, want of memory, or other like fact." *Evansich v. Gulf, C. & Santa Fe R.R. Co.*, 61 Tex. 24, 28 (1884).

*JLG Trucking, LLC v. Garza*, No. 13–0978, --- S.W.3d ----, 2015 WL 1870072 (Tex. April 24, 2015) (emphasis added) (attached at Tab A). The trial court thus committed error.

The ability to demonstrate bias, prejudice, and lack of truthfulness is especially important in situations where, as here, the witness wears two hats:

Once he or she has qualified as an expert, and explained fire science to the jury, the members of the jury are likely to perceive anything the investigator says as scientific fact, even when that is not the case. Particularly in a case where there is one individual serving as both the scientist and the law enforcement investigator or case agent, there exists a risk of confusion if the two roles are not distinguished.

A fire investigator's core competency is determining *where* the fire started. Recent studies have shown that the error rate for this important task may be shockingly high. And knowledge that the homeowner was behind his or her mortgage or recently had an argument with his or her spouse are facts that are not the least bit relevant to the task.

John J. Lentini, *Contextual Bias in Fire Investigations: Scientific vs. Investigative Data*, THE BRIEF, v. 44, no. 3 at 41 (Spring 2015) (published by the Tort Trial &

Insurance Prac. Sec. of the Am. Bar Ass'n) (emphasis in original) (attached at Tab B).

The trial court's error was thus harmful.

KELLY, DURHAM & PITTARD, L.L.P.

By:    /s/ Peter M. Kelly
       Peter M. Kelly, Lead Counsel
       State Bar No. 00791011
       1005 Heights Boulevard
       Houston, Texas 77008
       Telephone: 713.529.0048
       Facsimile: 713.529.2498
       Email: pkelly@texasappeals.com

       DOYLE RAIZNER LLP

       /s/ Michael Patrick Doyle
       Michael Patrick Doyle
       State Bar No. 06095650
       Andrew P. Slania
       State Bar No. 24056338
       2402 Dunlavy Street, Suite 200
       Houston, Texas 77006
       Telephone: 713.571.1146
       Facsimile: 713.571.1148
       Email: mdoyle@doyleraizner.com

       **Counsel for Wendy Schreiber**

**CERTIFICATE OF COMPLIANCE**

Relying on the word count function in the word processing software used to produce this document, I certify that the number of words in this supplemental (excluding any caption, signature, proof of service, and certificate of compliance) is 384.

This document complies with the typeface requirements of TRAP 9 because:

**WordPerfect X6 in 14-point Aldine401 BT.**


/s/ Peter M. Kelly
Peter M. Kelly

**CERTIFICATE OF SERVICE**

A true and correct copy of this *Appellant's Supplemental Authorities* has been forwarded to all counsel of record on April 29, 2015, by electronic service:

M. Micah Kessler
mkessler@NCK-Law.com
Kathleen Crouch
kcrounch@NCK-Law.com
NISTICO, CROUCH & KESSLER, P.C.
1900 West Loop South, Suite 800
Houston, Texas 77027

Linda J. Burgess
lburgess@winstead.com
Elliot Clark
eclark@winstead.com
WINSTEAD PC
401 Congress Ave., Suite 2100
Austin, Texas 78701

*Counsel for State Farm Lloyds*

/s/ Peter M. Kelly
Peter M. Kelly

# TAB A

--- S.W.3d ----, 2015 WL 1870072 (Tex.)
**(Cite as: 2015 WL 1870072 (Tex.))**



NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**JLG** Trucking, LLC, Petitioner,
v.
Lauren R. Garza, Respondent

NO. 13–0978

Supreme Court of Texas.
Argued February 26, 2015
OPINION DELIVERED: April 24, 2015

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

JUSTICE LEHRMANN delivered the opinion of the Court.

**\*1** This case requires us to review the trial court's exclusion of evidence on relevance grounds. The plaintiff was involved in two car accidents approximately three months apart. After the second accident, she sued the opposing driver in the first accident and alleged that this collision caused her injuries. The defendant sought to present two alternative defensive theories. First, the defendant presented expert testimony that the plaintiff's injuries were degenerative and thus not trauma-related at all. Alternatively, the defendant contended that the second accident caused her injuries. On the plaintiff's pretrial request, and because of the lack of expert testimony supporting the defendant's alternative theory, the trial court excluded all evidence of the second accident on relevance grounds. The trial court rendered judgment on the jury's verdict for the plaintiff, and the court of appeals affirmed. We hold that evidence of the second accident was relevant to the central issue of whether the defendant's negligence caused the plaintiff's damages. We further hold that the trial court committed harmful error in excluding the evidence, and particularly in refusing to allow cross-examination of the plaintiff's expert on the subject. Accordingly, we reverse the court of appeals' judgment and remand the case for a new trial.

### I. Background

On July 16, 2008, Lauren Garza was traveling south on U.S. Highway 83 in Zapata County when an 18–wheeler driven by a JLG Trucking, LLC employee rear-ended her truck. An ambulance was called to the scene but did not transport Garza to the hospital. Instead, Garza testified that her aunt took her to a nearby emergency clinic where x-rays were taken, although the record contains no medical records from the clinic regarding that visit. Five days later Garza saw an orthopedic surgeon, Dr. Guillermo Pechero, complaining of neck and back pain. An x-ray showed some straightening of the lordotic curve, which Dr. Pechero concluded

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was associated with muscle spasms in the neck. Dr. Pechero prescribed physical therapy, which Garza underwent for roughly eleven weeks.

On October 9, 2008, shortly after ceasing physical therapy, Garza was involved in a second car accident. She was taken by ambulance from the scene of the accident to a hospital on an immobilization board with a hard collar to prevent movement in her neck. At the hospital, Garza complained of pain in her head, neck, and chest. On October 31, Garza returned to Dr. Pechero for a follow-up visit, complaining of continuous pain in her neck that radiated into her shoulders. Dr. Pechero ordered an MRI, which revealed that Garza had two herniated discs in her neck. Dr. Pechero began a conservative treatment of primarily medication in hopes of avoiding surgery, but a March 2009 nerve study revealed that a nerve at the site of the herniations had become compressed, and a second MRI in August 2011 showed two additional herniated discs in her neck. Garza underwent spinal fusion surgery in January 2012. The surgery was successful, and at the time of trial Garza was "doing well." However, Garza lives with a scar on her neck, reduced neck mobility, the permanent presence of hardware from the surgery, and the possibility of future surgery.

**\*2** Garza sued JLG, alleging that the employee driver's negligence proximately caused her injuries and seeking damages for past and future medical expenses, loss of earning capacity, physical pain, mental anguish, physical impairment, and disfigurement.[FN1] Garza's treating physician, Dr. Pechero, served as her expert witness to testify that the July 2008 accident caused the herniated discs. JLG designated Dr. Bruce Berberian, a neuroradiologist, as its expert witness to testify that Garza was suffering from degeneration of her discs, and not a trauma-related injury at all. JLG also intended to introduce evidence of the October accident as an alternative cause of Garza's injuries, although JLG did not designate an expert to testify in support of that theory.

> FN1. Garza named the employee as a defendant, but it appears that he was never served with citation. Garza also asserted claims against JLG for negligent entrustment and gross negligence, but those claims were not submitted to the jury.

Garza filed a pretrial motion to exclude any evidence of the second accident on the grounds that such evidence was not relevant, or that its probative value was substantially outweighed by the unfair prejudice or confusion it would cause the jury, because "there is no causal connection between the injuries [Garza] is complaining of and the subsequent collision." After a hearing, the trial court granted Garza's motion to exclude.

Dr. Pechero testified by deposition at trial that the July accident caused Garza's injuries. He noted that Garza exhibited neck pain after that accident and that the October MMI revealed injuries consistent with a rear-end collision. One portion of the deposition played to the jury contained the following exchange between Dr. Pechero and Garza's counsel:

Q. Now, up to this point in the treatment of her you took a history, correct?

A. Correct.

Q. And Lauren indicated to you that she had not had any or been involved in any other ac-

cidents other than the one from July—July 16th of 2008; is that correct?

A. I don't think I asked her one way or the other on that.

....

Q. Well, you took a history, correct?

A. Correct.

Q. All right. And let's take a look at the July 21st note real quick.

A. Okay. Are you referring to the October note, or the July note?

Q. The July note.

A. Oh, okay. In the July note, she did not have any other history of injury.

Taking the position that this testimony opened the door to questions concerning the second accident, JLG renewed its objection to the exclusion of all mention or evidence of that accident. The trial court upheld its earlier exclusion ruling, and JLG submitted an offer of proof as to the testimony that would have been elicited from Dr. Pechero and the evidence that would have been presented in support of the second accident as an alternative cause. JLG's offer of proof included the police report regarding the second accident, photos of Garza's vehicle after the second accident, medical records documenting Garza's emergency treatment after that accident, and Dr. Pechero's testimony that he had not reviewed those medical records. Garza responded with an offer of proof consisting of Dr. Pechero's testimony that he had relied on Dr. Berberian's testimony that the second accident did not cause Garza's injuries to rule out that possibility. The jury found that JLG's employee's negligence proximately caused the July accident and awarded her $1,166,264.48 in damages. FN2

> FN2. The jury awarded $108,135.48 for past medical expenses, $110,000.00 for future medical expenses, $583,693.00 for future loss of earning capacity, $42,048.00 for past physical pain, $252,288.00 for future physical pain, $5,000.00 for past physical impairment, $57,600.00 for future physical impairment, and $7,500.00 for future disfigurement. The jury awarded $0 for past loss of earning capacity, past and future mental anguish, and past disfigurement.

**\*3** JLG appealed the trial court's judgment on the verdict, arguing that evidence of the second accident was relevant and that its exclusion amounted to harmful error because it prevented JLG from holding Garza to her burden of proving that JLG caused her injuries. The court of appeals affirmed, holding that the trial court did not abuse its discretion in excluding evidence of the second accident because "expert testimony would be required to establish any ... causal link between the second collision and Garza's injuries." ―― S.W.3d ――,―― (Tex.App.–San Antonio 2013).

## II. Analysis

We review a trial court's exclusion of evidence for an abuse of discretion. *Interstate*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Northborough P'ship v. State,* 66 S.W.3d 213, 220 (Tex.2001). Erroneous exclusion of evidence is reversible only if it probably resulted in an improper judgment. *Id.*; TEX. R. APP. P.P. 44.1(a)(1). In this case, the disputed evidence was excluded as irrelevant, and so the rules of evidence governing relevance are the starting point of our analysis.

### A. Evidence of the Second Accident Is Relevant to the Issue of Causation

Rule 401 broadly defines relevant evidence to include "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Evidence that is not relevant is inadmissible, while relevant evidence is admissible unless otherwise excluded by law. TEX. R. EVID. 402. Relevance also governs the scope of cross-examination in Texas, as the rules allow witnesses to be cross-examined "on any matter relevant to any issue in the case." TEX. R. EVID. 611(b). And it is well established that "any fact which bears upon the credit of a witness would be a relevant fact, ... whether it goes to his indisposition to tell the truth, his want of opportunity to know the truth, his bias, interest, want of memory, or other like fact." *Evansich v. Gulf, C. & Santa Fe R.R. Co.,* 61 Tex. 24, 28 (1884). Finally, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TEX. R. EVID. 403.

JLG argues that evidence of the second accident is relevant to the causation element of Garza's negligence claim. We agree. Establishing causation in a personal injury case requires a plaintiff to "prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries." *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). For example, when an accident victim seeks to recover medical expenses, she must show both "what all the conditions were" that generated the expenses and "that all the conditions were caused by the accident." *Guevara v. Ferrer,* 247 S.W.3d 662, 669 (Tex.2007). Further, "expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Id.* at 665. Finally, we have held that "if evidence presents 'other plausible causes of the injury or condition that could be negated, the [proponent of the testimony] must offer evidence excluding those causes with reasonable certainty.' " *Transcontinental Ins. Co. v. Crump,* 330 S.W.3d 211, 218 (Tex.2010) (quoting *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 720 (Tex.1997) (alteration in *Crump* ) (emphasis in *Crump* omitted)); *see also Harris v. Belue,* 974 S.W.2d 386, 393–94 (Tex.App.–Tyler 1998, pet. denied) (rejecting the argument that the plaintiff failed to negate other probable causes of her injury in light of the lack of factual support in the record for those proposed causes).

**\*4** In this case, Garza sought to prove that the negligence of JLG's employee caused the July accident. She also sought to prove by expert testimony from Dr. Pechero that this accident caused the herniated discs in her neck along with all of the associated pain, medical expenses,[FN3] loss of earning capacity, impairment, and disfigurement. JLG sought to undermine Garza's theory and Dr. Pechero's testimony by presenting evidence of the October 2008 accident as an alternative cause of those injuries. Garza argues that the record does not support a connection between the October accident and her injuries, rendering the evidence properly excluded.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. Garza did not seek to recover medical expenses associated with her emergency treatment immediately after the second accident.

Garza relies in part on *Farmers Texas County Mutual Insurance Co. v. Pagan,* 453 S.W.3d 454 (Tex.App.–Houston [14th Dist.] 2014, no pet.). In *Pagan,* the plaintiff alleged that various neck and shoulder injuries were caused by a March 2008 car accident. *Id.* at 458. The defendant sought to introduce evidence of an April 2009 "horse incident," FN4 which the trial court excluded. *Id.* at 459–60. The court of appeals affirmed, holding that the trial court "could reasonably conclude that informing the jury about a horse incident with no apparent connection to the lasting injuries at issue in this case would confuse the issues and mislead the jury." *Id.* at 463. The court noted in pertinent part that (1) the interrogatory response in which Pagan identified the horse incident did not mention any resulting neck or shoulder injuries, (2) the medical records associated with the incident noted only "contusions" resulting from the fall, and x-rays showed that her spine and shoulders were normal, and (3) records from Pagan's family doctor indicating that she complained of neck and shoulder pain at a visit after the horse incident did not reference the incident itself. *Id.*

FN4. The evidence of the facts surrounding that incident is inconsistent. Some evidence indicates that Pagan fell off a horse, other evidence indicates that she was "trampled," and still other evidence indicates that she fell while leading the horse on foot. 453 S.W.3d at 459–60.

Regardless of whether *Pagan* was correctly decided, which we need not address, the evidence of a connection between the proposed alternative cause and the plaintiff's injuries that the court found lacking in *Pagan* is present in this case. JLG's offer of proof indicates that, as a direct result of the second accident, Garza was transported to a hospital on an immobilization board and constrained with a hard c-collar around her neck, she complained of neck pain once she arrived, and she returned to Dr. Pechero three weeks later for the first time since the conclusion of her physical therapy with complaints of continuous pain in her neck radiating into her shoulder. At that time, the MRI revealed the herniated discs. The circumstances surrounding the second accident and its aftermath provide the necessary factual support to present the second accident as a "plausible cause" of Garza's injuries. FN5

FN5. Certainly, expert testimony in support of the alternative cause would lend support to its plausibility. And in some cases, expert testimony may in fact be necessary to elevate a proposed alternative cause from theoretically possible to plausible. But this is not that case.

Significantly, the exclusion of the second accident curtailed JLG's ability to probe Dr. Pechero's conclusions about causation by asking him to explain why he discounted the second accident as an alternative cause. JLG's offer of proof shows that, in formulating his opinion, Dr. Pechero did not review the records from Garza's emergency treatment after the second accident, which included the statements reflecting that Garza was experiencing neck pain in its wake. According to Garza's responsive offer of proof, Dr. Pechero's only explanation for ruling out the second accident as the cause of the herniations was that he relied on Dr. Berberian's testimony to that effect. But Dr. Berberian concluded that *neither* accident caused Garza's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

injuries, calling into question the credibility of the methods underlying Dr. Pechero's approach. *Cf. E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 559 (Tex.1995) (upholding the exclusion of expert testimony when the expert failed to "carefully consider [and rule out] alternative causes");[FN6] *see also* TEX. R. EVID.. 607 ("The credibility of a witness may be attacked by any party...."). JLG could not adequately cross-examine Dr. Pechero on those methods without discussing the improperly excluded evidence.

> FN6. JLG did not move to exclude Dr. Pechero's testimony in the trial court. We cite *Robinson* because it highlights the significance of alternative causes when a plaintiff must prove causation by expert testimony.

### B. The Court of Appeals Erroneously Conflated Relevance and Evidentiary Sufficiency

**\*5** The court of appeals held that the trial court correctly excluded evidence of the second accident because "no expert testimony was proffered to establish that the second collision caused any of Garza's injuries." —— S.W.3d at ——. As support for its holding, the court of appeals relied on a line of cases addressing the necessity of expert medical testimony to prove causation in the personal-injury context. As discussed below, in doing so the court of appeals conflated the concepts of relevance and evidentiary sufficiency and improperly shifted the burden of proof to the defendant.

Principal among the cases cited by the court of appeals was *Guevara v. Ferrer,* 247 S.W.3d 662 (Tex.2007). That case, like this one, involved a car accident that a jury found the defendant caused. *Id.* at 663, 665. The plaintiff, who had a complicated medical history that included hypertension, heart disease, and kidney failure, complained of stomach pains and received emergency treatment, including abdominal surgery, immediately after the accident. *Id.* at 663–64. Following that surgery, he spent three-and-a-half months in the hospital, two weeks in a continuing care facility, and two more weeks in another medical facility. *Id.* at 664. His family sought to recover all the medical bills generated by his stays at the hospital and both facilities, which exceeded $1 million, but did not present expert medical evidence to prove that the accident caused those expenses to be incurred. *Id.* at 664–65. We held that, while "the evidence [was] legally sufficient to support a finding that *some* of his medical expenses [such as those associated with his post-accident treatment in the emergency room] were causally related to the accident," it was "not legally sufficient to prove what the conditions were that generated *all* the medical expenses or that the accident caused *all* of the conditions and the expenses for their treatment." *Id.* at 669–70 (emphases added).

In *Guevara,* we applied the well-established general rule, cited above, that "expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Id.* at 665 (citing cases). And we did so in the context of considering the legal sufficiency of non-expert evidence to support a finding of causation. But we did not hold that the lack of expert testimony rendered any of the evidence irrelevant or otherwise admissible. In fact, relevance was not at issue in *Guevara.*[FN7] In this case, although the court of appeals was purporting to analyze relevance, in effect it was improperly analyzing whether the evidence was legally sufficient to support a finding that the second accident caused Garza's injuries. But JLG did not have the burden to prove causation; Garza did. It was Garza's burden to prove that the first accident caused her injuries, and, as discussed above, the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

record in this case sufficiently demonstrates that the second accident is at least relevant to that inquiry even without an expert proponent.

> FN7. We did confirm in *Guevara* that "evidence of temporal proximity ... between an event and subsequently manifested conditions" is not irrelevant to causation, although "temporal proximity ... does not, by itself, support an inference of medical causation." 247 S.W.3d at 667–68.

Further, JLG did not rule out the relevance of the second accident by presenting expert testimony that Garza's injuries were degenerative and not trauma-induced. Parties may plead conflicting claims and defenses in the alternative so long as they have a "reasonable basis in fact [and] law." *Low v. Henry,* 221 S.W.3d 609, 615 (Tex.2007). In turn, parties may present evidence of alternative, and even inconsistent, theories of relief, leaving to the jury to "choose the theory that it believes based upon its resolution of the conflicting evidence." *Wilson v. Whetstone,* No. 03–08–00738–CV, 2010 WL 1633087, at *10 (Tex.App.–Austin April 20, 2010, pet. denied) (mem.op.) (holding that the plaintiff's claim and evidence of the parties' acquiescence to the alleged property boundary line were not fatal to her adverse possession claim, even assuming that the claims were mutually exclusive); *see also In re Arthur Andersen LLP,* 121 S.W.3d 471, 482 n.32 (Tex.App.–Houston [14th Dist.] 2003, orig. proceeding) (noting that a defendant could deny liability for conspiracy while simultaneously alleging that third parties were also liable for conspiracy). But the burden still falls on the plaintiff to establish the elements of her cause of action.

**\*6** In this case, as explained above, the burden was on Garza, the plaintiff, to establish both that JLG caused the July 2008 accident and that this accident caused her injuries. Part of that burden was to exclude with reasonable certainty other plausible causes of her injuries supported by the record. *Crump,* 330 S.W.3d at 218. JLG's decision to present Dr. Berberian's testimony in support of its theory that Garza's injuries were degenerative–which the jury apparently found unpersuasive–did not relieve Garza of that burden. The defendant's responsibility "is not that of proving, but the purely negative one of repelling or making ineffective the adversary's attempts to prove." James B. Thayer, *The Burden of Proof,* 4 HARV. L. REV. 45, 56 (1890). In its efforts to repel Garza's attempts to prove her case, JLG was entitled to present evidence of the second accident to the jury, which was relevant to Garza's theory of causation irrespective of Dr. Berberian's testimony. The trial court therefore abused its discretion in excluding that evidence.

### C. Reversible Error

The trial court's error in excluding evidence of the second accident is reversible only if it probably caused the rendition of an improper judgment. TEX. R. APP. P.. 44.1(a)(1). We have declined to establish any "specific test" for determining whether evidentiary error resulted in an improper judgment, but we have held that the appellate court must review the entire record, "considering the state of the evidence, the strength and weakness of the case, and the verdict." *Reliance Steel & Aluminum Co. v. Sevcik,* 267 S.W.3d 867, 871 (Tex.2008) (internal quotation marks and citation omitted). We explained in *Sevcik* that "if erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful." *Id.* at 873. "By contrast, admission or exclusion is likely harmless if the evidence was cumulative, or if the rest of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

evidence was so one-sided that the error likely made no difference." *Id.* In this case, the evidence of the second accident was crucial to whether JLG's negligence caused Garza's injuries, and the harm in its exclusion was compounded by JLG's curtailed cross-examination of Dr. Pechero. Accordingly, we hold that the trial court's exclusion of evidence regarding the second accident was reversible error requiring a new trial. FN8

> FN8. JLG did not contest on appeal the finding that its negligence caused the first accident. It asserted only that the erroneously excluded evidence tainted the findings as to the damages caused by that accident. However, because liability was contested in the trial court, both liability and damages must be remanded. *Estrada v. Dillon,* 44 S.W.3d 558, 562 (Tex.2001) (per curiam) (applying TEX. R. APP. P.P. 44.1(b)).

### III. Conclusion

The trial court abused its discretion in excluding evidence of the second accident, which was relevant to whether JLG's negligence caused Garza's damages. Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court for a new trial in accordance with this opinion.

Tex., 2015
JLG Trucking, LLC v. Garza
--- S.W.3d ----, 2015 WL 1870072 (Tex.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



## KEYCITE

**H JLG Trucking, LLC v. Garza,** **--- S.W.3d ----, 2015 WL 1870072 (Tex., Apr 24, 2015)** (**NO. 13-0978**)

### History

### Direct History

▶  1 JLG Trucking LLC v. Garza, 2013 WL 5570823 (Tex.App.-San Antonio Oct 09, 2013) (NO. 04-13-00043-CV), review granted (Jan 30, 2015)
*Judgment Reversed by*

=>  2 **JLG Trucking, LLC v. Garza,** --- S.W.3d ----, 2015 WL 1870072 (Tex. Apr 24, 2015) (NO. 13-0978)

### Court Documents

### Appellate Court Documents (U.S.A.)

**Tex. Appellate Petitions, Motions and Filings**

3 JLG TRUCKING, LLC, Petitioner, v. Lauren R. GARZA, Respondent., 2014 WL 470789 (Appellate Petition, Motion and Filing) (Tex. Jan. 13, 2014) **Petition for Review** (NO. 13-0978)

4 JLG TRUCKING, LLC, Petitioner, v. Lauren R. GARZA, Respondent., 2014 WL 2472337 (Appellate Petition, Motion and Filing) (Tex. May 21, 2014) **Response of Lauren R. Garza to Petition for Review of JLG Trucking, LLC** (NO. 13-0978)

5 JLG TRUCKING, LLC, Petitioner, v. Lauren R. GARZA, Respondent., 2014 WL 2761642 (Appellate Petition, Motion and Filing) (Tex. Jun. 4, 2014) **Reply in Support of Petition for Review** (NO. 13-0978)

**Tex. Appellate Briefs**

6 JLG TRUCKING, LLC, Petitioner, v. Lauren R. GARZA, Respondent., 2014 WL 4185526 (Appellate Brief) (Tex. Aug. 20, 2014) **Petitioner's Brief on the Merits** (NO. 13-0978)

**Tex.App.-San Antonio Appellate Briefs**

7 JLG TRUCKING, LLC, Appellant, v. Lauren GARZA, Appellee., 2013 WL 7090037 (Appellate Brief) (Tex.App.-San Antonio Apr. 25, 2013) **Brief of Appellant** (NO. 04-13-00043-CV)

© 2015 Thomson Reuters. All rights reserved.

8 JLG TRUCKING, LLC, Appellant, v. Lauren GARZA, Appellee., 2013 WL 7090038 (Appellate Brief) (Tex.App.-San Antonio Jun. 25, 2013) **Brief of Appellee, Lauren Garza** (NO. 04-13-00043-CV)

## Tex. Oral Arguments

9 JLG Trucking, LLC, v. Lauren R. Garza., 2015 WL 1359407 (Oral Argument) (Tex. Feb. 26, 2015) **Oral Argument** (NO. 13-0978)

# Dockets (U.S.A.)

## Tex.

10 JLG TRUCKING, LLC v. LAUREN R. GARZA, NO. 13-0978 (Docket) (Tex. Dec. 9, 2013)

## Tex.App.-San Antonio

11 JLG TRUCKING LLC v. LAUREN R. GARZA, NO. 04-13-00043-CV (Docket) (Tex.App.-San Antonio Jan. 17, 2013)

# Expert Court Documents (U.S.A.)

## Tex. Appellate Petitions, Motions and Filings

12 JLG TRUCKING, LLC, Petitioner, v. Lauren R. GARZA, Respondent., 2014 WL 470789 (Appellate Petition, Motion and Filing) (Tex. Jan. 13, 2014) **Petition for Review** (NO. 13-0978)

13 JLG TRUCKING, LLC, Petitioner, v. Lauren R. GARZA, Respondent., 2014 WL 2472337 (Appellate Petition, Motion and Filing) (Tex. May 21, 2014) **Response of Lauren R. Garza to Petition for Review of JLG Trucking, LLC** (NO. 13-0978)

14 JLG TRUCKING, LLC, Petitioner, v. Lauren R. GARZA, Respondent., 2014 WL 2761642 (Appellate Petition, Motion and Filing) (Tex. Jun. 4, 2014) **Reply in Support of Petition for Review** (NO. 13-0978)

## Tex. Appellate Briefs

15 JLG TRUCKING, LLC, Petitioner, v. Lauren R. GARZA, Respondent., 2014 WL 4185526 (Appellate Brief) (Tex. Aug. 20, 2014) **Petitioner's Brief on the Merits** (NO. 13-0978)

© 2015 Thomson Reuters. All rights reserved.

# TAB B

# Contextual Bias in Fire Investigations

## Scientific vs. Investigative Data

### By John J. Lentini



Contextual bias is an issue that has come to the forefront of forensic science in the last few years, and nowhere is contextual bias more likely to influence scientific determinations than in fire investigation. This is largely because many fire investigators also serve simultaneously as law enforcement officers.

This article will explore the different duties, responsibilities, and ethical requirements of the scientist and the law enforcement officer. What data constitute scientific evidence and what constitute investigative information? Can the two be separated? Should they be separated? How does the science suffer when the scientist is influenced by contextual bias? How does law enforcement suffer when a fire investigator is unable to classify a fire based on the physical evidence?

There are no easy answers to these questions. In one case, the ethical and valid response may be obvious, while in the next case, a fire investigator attempting to assist the jury to understand the physical evidence can easily cross the line and conflate valid, but domain irrelevant, investigative data with scientific proof. It is up to counsel to help the expert witnesses delineate between information that can potentially bias the interpretation of the physical evidence, and information that is necessary for its objective evaluation.

## "Scientific" Knowledge vs. "Investigative" Knowledge

The fire investigation profession some time ago committed itself to conducting scientific investigations. The result has been a significant improvement in the reliability of origin and cause determinations. In the intervening years, the "relevant investigative community," represented by the National Fire Protection Association (NFPA) Technical Committee on Fire Investigations, has tried to root out those practices that make arriving at a valid scientific conclusion about the origin and cause of the fire more difficult. One of the obstacles to reaching a valid conclusion is cognitive bias.

The concept of expectation bias was first introduced to *NFPA 921: Guide for Fire and Explosion Investigations* in the 2008 edition, when the following caution about expectation bias was added.

**4.3.8 Expectation Bias.** Expectation bias is a well-established phenomenon that occurs in scientific analysis when investigator(s) reach a premature conclusion without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, the investigator(s) uses the premature determination to dictate investigative processes, analyses, and, ultimately, conclusions, in a way that is not scientifically valid. The introduction of expectation bias into the investigation results in the use of only that data that supports this previously formed conclusion and often results in the misinterpretation and/or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method.[1]

The question then becomes, what constitutes "all of the relevant data"? Relevant to what? Relevant to a reliable scientific determination, or relevant to the correct law enforcement conclusion? The two are not necessarily the same.

When fire investigators testify as expert witnesses, they are allowed the privilege of expressing an opinion to a jury, as long as that testimony meets these criteria:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.[2]

Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier of fact.

"There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."[3]

Once he or she has qualified as an expert, and explained fire science to the jury, the members of the jury are likely to perceive anything the investigator says as scientific fact, even when that is not the case. Particularly in a case where there is one individual serving as both the scientist and the law enforcement investigator or case agent, there exists a risk of confusion if the two roles are not distinguished.

A fire investigator's core competency is determining *where* the fire started. Recent studies have shown that the error rate for this important task may be shockingly high.[4] And knowledge that the homeowner was behind on his or her mortgage or recently had an argument with his or her spouse are facts that are not the least bit relevant to the task.

In *Michigan Millers Mutual Insurance Corp. v. Benfield*, one of the first reliability challenges to a fire investigator

PHOTO: ISTOCK



**TIP**

When working with experts, beware of mixing fact testimony with opinion testimony, or your expert may lose that "aura of special reliability."

serving in the role of the scientist, the Eleventh Circuit Court of Appeals expounded on the special aura of reliability that surrounds "scientific testimony":

> The use of "science" to explain how something occurred has the potential to carry great weight with a jury, explaining both why counsel might seek to couch an expert witness's testimony in terms of science, as well as why the trial judge plays an important role as the gate-keeper in monitoring the evidentiary reliability of such testimony. *See Daubert*, [509 U.S. 579, 590 (1993)]. Because of the manner in which this expert's testimony was presented to the jury, we find no error by the trial court in determining *Daubert* applied to the testimony at issue.[5]

The *Benfield* decision was handed down in May 1998, about a year before the Supreme Court found that *Daubert* and the Federal Rules of Evidence apply to *all* expert testimony, not just scientific testimony. In *Kumho Tire Co. v. Carmichael*, the Supreme Court held that the federal rules did not distinguish between "scientific," "technical," or "other specialized" knowledge.[6] Expert testimony is expert testimony, and the court system relies on it in most cases that go to trial today.

Problems can arise when expert testimony is comingled with other investigative information. This problem was recently highlighted in a case decided by the Seventh Circuit Court of Appeals, in which

it was argued that a law enforcement officer crossed the line when he attempted to put an "expert gloss" on what would otherwise be admissible fact witness testimony:

> "Interpretations" of unambiguous words or phrases that are plainly within the jury's understanding are unlikely to be admissible under Rule 702. Expert testimony does not assist where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic.
>
> . . . .
>
> . . . The witness's dual role might confuse the jury, or a jury might be smitten by an expert's "aura of special reliability" and therefore give his factual testimony undue weight. Experts famously possess an "aura of special reliability" surrounding their testimony. And it is possible that the glow from this halo may extend to an expert witness's fact testimony as well, swaying the jury by virtue of his perceived expertise rather than the logical force of his testimony. Or, the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial. Alternatively, the mixture of fact and expert testimony could, under some circumstances, come close to an expert commenting on the ultimate issue in a criminal matter.[7]

The court went on to admonish judges to instruct juries about what testimony is expert testimony and what is not, and it further stated that prosecutors should structure their examination of a witness to allow for a separation of the expert testimony from the fact testimony when the law enforcement officer testifies in a dual role.[8]

## The Holistic Approach

In 2009, two ATF-certified fire investigators, Steven Avato and Andrew Cox, published an interesting and provocative article in the *Fire and Arson Investigator* entitled "Science and Circumstance: Key Components in Fire Investigation." They provide two scenarios of a fire that resulted in identical physical evidence. In the first scenario, Mr. Smith says "Hello" to his secretary, goes into his office, and closes the door. He then lights a candle and discards the match in a trash can. He receives a phone call and immediately leaves the office, closing the door behind him. A fire erupts in the trash can. In the second scenario, Mr. Smythe angrily storms past his secretary ranting, "I'll fix them. They'll pay for firing me." He then enters the office, slams the door behind him, and throws a lit match into the trash can. He exits the office and closes the door and shouts "Sic semper tyrannis!"[9]

The authors argue that classifying the second fire as "undetermined" is a result of disregarding relevant data, and state, "This approach is not only a willful departure from scientifically based problem solving, but it is also a dangerous methodology that has most certainly led to erroneous origin and cause determinations."[10] But what are the data relevant to? Certainly, *the jury* is entitled to learn all of the facts uncovered during the investigation of this fire, but does that allow the investigator, using his or her expertise as a fire scientist, to conclude based on the scene examination that he or she has "scientifically" determined that the fire was intentional?

The second fire was certainly intentionally set, but no expert analysis or opinion is required to reach that conclusion. The jury requires no assistance in determining what happened here. Sometimes the science is not useful, nor is it necessary. In fact, presenting a perfectly logical and correct conclusion under the

---

**John J. Lentini** *is the president of Scientific Fire Analysis, LLC. He conducts, supervises, and reviews fire, arson, explosion, and asphyxiation investigations, and provides expert testimony on the results. He can be reached at scientific.fire@yahoo.com.*

color of "science" might be considered disingenuous.

Avato and Cox set up several scenarios that do not describe how anyone investigates fires, but they correctly state that it is the investigator's responsibility to find the "demarcation" between relevant scientific data and data that are not relevant. No matter how that line is drawn, it surely travels through a domain called "witness statements." Statements that describe observations about the fire, or knowledge

*The inherent tension between the goals and methods of science and those of litigation puts significant pressure on expert witnesses.*

of the arrangement of furniture, or when the electricity was disconnected clearly belong in the relevant scientific data column. Statements about motive, means, and opportunity are not relevant to an origin or cause determination, and *NFPA 921* specifically states that such "data" should only be considered *after* the origin and cause have been determined.

This author was requested to examine the evidence in the case where a defendant was accused of pouring gasoline on his girlfriend and setting her on fire. The prosecutor had heard several versions of the event and wanted an independent evaluation of the evidence. Based on the physical evidence, however, three scenarios were equally supported:

A. The defendant poured gasoline on the victim, and then he ignited it.
B. The defendant poured gasoline on the victim, and then the victim ignited it.
C. The victim poured gasoline on herself, and then she ignited it.

Scientific evaluation of the physical evidence was of no help.

In another case, the owner of a retail establishment that sold skiing equipment in the winter and swimming pool supplies in the summer solicited several individuals to burn the store down so she could collect on her insurance policy. Finding no takers, the woman declared she would do it herself, and when her boyfriend challenged her, she wagered $500 that she would, in fact, burn the store down. And burn it did.

It burned so completely, in fact, that an investigative team consisting of five certified fire investigators, an electrical engineer, a fire protection engineer, a chemist, and a canine team who spent three days on the scene were unable to determine either the origin or the cause. It took more than five years to bring the case to trial, and the lack of a demonstrated origin and cause troubled the jury. In the end, however, they did not find that there was reasonable doubt about the store owner's guilt, and they convicted her. The investigators did the right thing by declaring, even knowing how many times the woman had solicited others to commit arson, that the origin and cause were undetermined. The jury would not have been helped by having an expert opine that the fire was intentionally set. They were able to come to that conclusion themselves, based on common sense and investigative information. This is yet another case where the scientific evaluation of the evidence was of no help. The defendant got a fair trial, and had no grounds to appeal the admission of expert testimony.

## Ethical Considerations

Ethics can be defined as the science of human duty in its broadest sense. If we change the word "human" to "professional" we can define ethics for every profession, but those ethics are different for each. Scientists must live by a different set of rules than law enforcement officers. Prosecutors must live by a different set of rules than defense attorneys. One hopes that all of the players in the criminal justice system behave ethically.

One of the most respected forensic scientists on the planet, Dr. Douglas Lucas, spent more than 20 years as chairman of the Ethics Committee in the American Academy of Forensic Sciences. Dr. Lucas has written and spoken extensively on the subject of ethics. He states that one of the major causes of pressure on those who serve as expert witnesses is the adversary system of justice because of the inherent tension between the goals and methods of science and the goals and methods of litigation. This is so even though both make sense, and both serve vital social functions. In describing the different ethical obligations of scientists and law enforcement officers, Dr. Lucas writes:

> For a law enforcement officer, acting on information received from another officer is quite proper. For a scientist, however, arriving at a conclusion in the absence of proper scientific data, is quite unethical. This distinction is particularly important, and sometimes difficult, for scientists who are part of a law enforcement agency, and especially for those who are also sworn officers.[11]

The tension between science and the law was recognized by Justice Blackmun in the *Daubert* decision, when he wrote:

> [T]here are important differences between the quest for truth in

the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.[12]

Dr. Lucas served on the Office of Inspector General's (OIG's) commission convened in the mid-1990s to investigate allegations of irregularities in the FBI Laboratory's Explosives Unit. At that time, the testifying experts were required to be field agents as well as scientists, and unfortunately, some of them confused the two roles.

In one instance, a chemist by the name of Rudolph conducted a preliminary examination of a suspected explosive, and got results "consistent with" PETN, the explosive used in detonator cord. He testified positively at the trial of a suspected terrorist that he was as sure as he could be that he had identified PETN, but on cross-examination, he had to admit that he was using a combination of "scientific" and "investigative" information to reach his conclusion. Detonator cord had been found in a garbage container near the defendant's residence.

At least partly as a result of the devastating cross-examination of Rudolph at the trial, the defendant was acquitted. The United States attorney was not happy. In a four-page complaint to the FBI Laboratory director, he wrote:

The first deficiency in Rudolph's analysis seems obvious. Relying on the hearsay views of field agents in rendering an opinion as to the presence of a chemical compound seems obviously wrong-headed. The FBI chemist is being asked to *independently* ascertain the existence of a substance not just regurgitate information he has received from the field. Secondly, the information from the field agents may be wrong or so speculative as to be accorded little weight. Finally, using any basis other than instrumental analysis for an opinion as to the presence of a chemical or compound leads, as in this case, to insufficient instrumental testing.[13]

Because scientific testimony has the potential to carry great weight with the jury, courts have a right to expect that testimony presented as science is based on real science that is independent of other field information. The OIG report stated, "We conclude that Rudolph's performance in *Psinakis* was wholly inadequate and unprofessional."[14] The commission did not, however, find a factual basis to conclude that he intentionally overstated or biased his conclusions.

The OIG also looked into the analysis of evidence in the first World Trade Center bombing in 1993. In that case, an FBI chemist named Williams opined that the main charge was 1,200 pounds of urea nitrate, not because it was found at the scene, but because it was found at a bomb factory associated with the defendants, and it would take 1,200 pounds of the explosive to cause the damage to the building. The OIG asked Williams to justify his testimony, and he could not. It was based entirely on contextual bias. The OIG report stated, "Williams failed in his responsibility to provide the court with an objective, unbiased expert opinion."[15]

In general, the OIG investigation found very few problems with the FBI's approach to science. But because a very few examiners behaved in an unethical manner in a relatively small number of cases, over 3,000 major criminal cases were cast into doubt, and the otherwise well-deserved excellent reputation of a fine organization was tarnished.

### Other Examples of Context Bias

Dr. Itiel Dror is one of the world's leading experts on contextual bias. After the Brandon Mayfield fingerprint fiasco,[16] Dror conducted an experiment to test the effect of context bias on five fingerprint examiners. A different pair of fingerprints was prepared for each of the expert participants. Each pair of prints had been previously identified as a match by that same expert five years earlier, within the normal course of his or her work. The latent fingerprints had been obtained from the crime scenes and were all presented again to the experts in their original format. They were told that the pair of prints was the one that was

> *Scientific testimony is expected to be real science, independent of other field information.*

erroneously matched by the FBI as the Madrid bomber, thus creating an extraneous context that the prints were a nonmatch. Three of the five examiners changed their identification to "nonmatch." One changed to "inconclusive," and only one held to the original "match" determination.[17]

The Texas Forensic Science Commission (FSC) spent three years (2008–2011) studying the science, and the lack thereof, that contributed to the exoneration of Ernest Ray Willis and the wrongful execution of Cameron Todd Willingham in 2004.[18] In April 2011, the FSC issued its report, which discussed the cognitive biases to which fire investigators (and all forensic scientists) are subject. The FSC stated, "cognitive biases are not the result of character flaws; instead, they are common features of decision-making."[19] One of the key recommendations, of 17 made by the FSC, was enhanced admissibility hearings in all arson cases. It is at such a hearing that the potentially biasing "data" that may have influenced the investigator's determination of arson can be explored.[20] For an attorney on either side of an arson case, this report should be required reading.

## Conclusion

Law enforcement is an important and honorable profession. It plays a central role in keeping a civilized society civilized. But it is not science. Lawyers are also not scientists. All have different ethical obligations. Legal "proof" and scientific "proof" are different. Nor is the problem of finding or failing to find the demarcation between scientific and investigative data confined to fire investigators or to law enforcement. Cognitive biases are a human condition that afflict both the public and the private sector, and both prosecution and defense attorneys.

This author has previously suggested means to minimize expectation bias in fire cases by separating the duties of the principal investigator from the fire scene analyst. This methodology, which involves protecting the scene investigator from potentially biasing information, has been applied successfully.[21] Law enforcement officers can use science to aid in the search for justice, but if the science is to be used fairly and effectively, it is important that scientific evidence be reliable and independent. ∎

### Notes

1. NFPA 921: GUIDE FOR FIRE AND EXPLOSION INVESTIGATIONS 20 (2014).

2. FED. R. EVID. 702.

3. FED. R. EVID. 702 advisory committee's note (quoting Mason Ladd, *Expert Testimony*, 5 VAND. L. REV. 414, 418 (1952)).

4. Steven W. Carman, Paper Presented at the Interscience Communications 2009 Fire and Materials Conference, San Francisco, Cal.: Progressive Burn Pattern Development in Post-Flashover Fires (Dec. 2008), *available at* www.carmanfireinvestigations.com/publications.html.

5. 140 F.3d 915, 920 (11th Cir. 1998).

6. 526 U.S. 137 (1999).

7. United States v. Christian, 673 F.3d 702, 710–12 (7th Cir. 2012) (citations omitted) (internal quotation marks omitted).

8. *Id.* at 712–13.

9. Steven J. Avato & Andrew T. Cox, *Science and Circumstance: Key Components in Fire Investigation*, 59 FIRE & ARSON INVESTIGATOR (Int'l Ass'n of Arson Investigators), no. 4, Apr. 2009, at 47, 47.

10. *Id.*

11. Douglas Lucas, Presentation to the Canadian Association of Forensic Scientists, Toronto, Ont.: Forensic Science and Ethics—An Essential Association (Dec. 1, 2010).

12. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596–97 (1993).

13. Letter from Ben Burch, Assistant U.S. Attorney, to John Hicks, FBI Lab. Dir. (July 8, 1989), *quoted in* USDOJ/OIG, THE FBI LABORATORY: AN INVESTIGATION INTO LABORATORY PRACTICES AND ALLEGED MISCONDUCT IN EXPLOSIVES-RELATED AND OTHER CASES pt. 3.A.II.A. (1997) [hereinafter FBI LABORATORY INVESTIGATION REPORT], *available at* www.justice.gov/oig/special/9704a/.

14. FBI LABORATORY INVESTIGATION REPORT, *supra* note 13, at pt. 3.A.II.B.5.

15. *Id.* at pt. 3.C.II.B.

16. Brandon Mayfield, an Oregon attorney, was erroneously linked to the 2004 Madrid train bombings based on a fingerprint found on a bag of detonators. Investigators also knew he was a Muslim and advertised his legal services in a publication owned by a suspected terrorist. *See* OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF JUSTICE, A REVIEW OF THE FBI's HANDLING OF THE BRANDON MAYFIELD CASE (2006), *available at* www.justice.gov/oig/special/s0601/final.pdf.

17. Itiel E. Dror et al., *Contextual Information Renders Experts Vulnerable to Making Erroneous Identifications*, 156 FORENSIC SCI. INT'L 74 (2006).

18. Ernest Ray Willis and Cameron Todd Willingham were convicted of murder by arson. The Innocence Project urged the FSC to review both cases after an independent report concluded that neither fire was arson. *See* ARSON REVIEW COMM., INNOCENCE PROJECT, REPORT ON THE PEER REVIEW OF THE EXPERT TESTIMONY IN THE CASES OF STATE OF TEXAS v. CAMERON TODD WILLINGHAM AND STATE OF TEXAS v. ERNEST RAY WILLIS (2006), *available at* www.innocenceproject.org/files/imported/arsonreviewreport-4.pdf.

19. TEX. FORENSIC SCI. COMM'N, WILLINGHAM/WILLIS INVESTIGATION 37 (2011), *available at* www.fsc.texas.gov/sites/default/files/FINAL_1.pdf.

20. *Id.* at 48–49.

21. John Lentini, Paper Presented at the 3rd International Symposium on Fire Investigations Science and Technology (ISFI), Sarasota, Fla.: Toward a More Scientific Determination: Minimizing Expectation Bias in Fire Investigations (2008), *available at* www.firescientist.com/publications.php.